**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Justin Stein, et al., | No. CV-20-00102-TUC-JCH |
| Plaintiffs, | **ORDER** |
| v. | |
| Alyssa Depke, et al., | |
| Defendants. | |

In this case, as relevant to the remaining claims, Defendant DCS agents removed Plaintiffs Justin and Jacqueline Stein's son C.S. and Plaintiff Grace Reid's son L.G. In both cases, Defendants relied on Plaintiffs' consent to removal, which Plaintiffs allege was never secured. Before the Court are Defendants' motions for summary judgment. Doc. 83 (Hanson); Doc. 89 (Depke & Fregoso). Defendants argue that a reasonable official in the same circumstances would have thought consent was secured. Defendants thus claim entitlement to qualified immunity from trial. The issues are fully briefed, Docs. 95, 97, 106, 107, and the Court heard oral argument on August 16, 2023. Doc. 109 ("Hr'g Tr.").

Under the Steins' versions of the facts, which the Court must accept at this stage, Depke and Fregoso violated clearly established law by failing to secure parental consent to removal. The Steins' evidence could convince a jury that Depke and Fregoso did not explain basic aspects of removal and told the Steins "there is no turning back" when the Steins withdrew their consent. The Steins' evidence could also convince a jury that Depke and Fregoso told the Juvenile Court the Steins did not want their son back shortly after the

Steins said they did want him back.

Under Reid's version of the facts, Hanson did not violate clearly established law. Reid's evidence could convince a jury only that Hanson mistakenly believed Reid wanted DCS to take custody of L.G. That potential mistake, and Hanson's other actions, were objectively reasonable. Reid's version of the facts also does not show a violation of law clearly enough established to place any issue "beyond debate." Reid's evidence raises issues of the scope and intelligence of Reid's consent, not coercion. Unlike the law on coerced consent, the law on the scope and intelligence of consent was not clearly established enough in 2018 to notify Hanson that his actions were unlawful. There is nothing for a jury to do under these circumstances.

Consequently, a trial is needed in the Steins' case but not in Reid's case. The Court will deny Depke's and Fregoso's motion for summary judgment and schedule a trial-setting conference, and grant Hanson's motion for summary judgment.

**I.      Legal Standard**

Summary judgment is appropriate when the parties have no genuine dispute as to any material fact.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A dispute is genuine if a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986). A fact is material if it might affect the outcome of the suit. *Id.*

The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. A movant without the ultimate burden of persuasion at trial may carry its initial burden either by producing evidence negating an essential element of the nonmovant, or by showing that the nonmovant does not have enough evidence of an essential element to carry its ultimate burden. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Id.* at 1102–03. If the movant meets its initial responsibility, the burden shifts to

the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material. *Liberty Lobby*, 477 U.S. at 248; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1). The Court must believe the nonmovant's evidence and draw all justifiable inferences in the nonmovant's favor.  *Liberty Lobby*, 477 U.S. at 255.

**II.    Analysis**

Plaintiffs seek relief under 42 U.S.C. § 1983, and Defendants claim entitlement to qualified immunity. *Compare* Doc. 25 at 9, *with* Docs. 83 at 13, 89 at 13. Section 1983 creates a cause of action against any person who violates another person's constitutional rights under color of law. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1106 (9th Cir. 2001); *see* 42 U.S.C. § 1983. But "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When determining whether a public official is immune from liability for acts performed in an official capacity, "qualified immunity is the general rule[.]" *Harlow*, 457 U.S. at 807. A public official is entitled to qualified immunity unless the Plaintiff shows: "(1) the official[s] violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

The first prong of a qualified immunity analysis requires the Court to determine whether the circumstances of C.S.'s or L.G.'s removal violated the Constitution. The First, Fourth, and Fourteenth Amendments provide a guarantee "that parents will not be separated from their children without due process of law except in emergencies." *Mabe*, 237 F.3d at 1107–09; *see also Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 1999) (internal citations omitted); *Demaree v. Pederson*, 887 F.3d 870 (9th Cir. 2018). "For parents, the right to familial association is generally grounded in the Fourteenth Amendment's Due Process Clause, while claims brought by children are evaluated under

the more "specific" Fourth Amendment right to be free from unreasonable seizures." *David v. Kaulukukui*, 38 F.4th 792, 799 (9th Cir. 2022) (citing *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 788–89 & n.2 (9th Cir. 2016) (en banc)).

Narrow circumstances control when the government may constitutionally remove children from their families without a court order or warrant. *Demaree*, 887 F.3d at 878. Defendants do not seek summary judgment on the ground that C.S. or L.G. were removed under a court order, exigent circumstances, or probable cause.[1] At oral argument, Defendants affirmatively stated that "[e]xigent circumstances have nothing to do with either case." Hr'g Tr. at 3:18–19. Defendants' motions for summary judgment do not discuss any exception other than consent. *See generally* Docs. 83, 89. Defendants have thus failed to carry their initial burden on this element.[2]

Absent a court order, exigent circumstances, or probable cause, consent is the only exception to the general prohibition on separating children from their parents. Consent must be "voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973). Whether consent is voluntary is a question of fact determined from the totality of all the circumstances. *See id.* at 227. Consent must also be "unequivocal and specific" and "freely and intelligently given." *United States v. Basher*, 629 F.3d 1161, 1167 (9th Cir. 2011) (citations omitted). The scope of consent is "generally defined by its expressed object." *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (scope of consent to search car for narcotics extended to paper bag where narcotics might be carried); *United States v. Taylor*, 60 F.4th 1233, 1244 (9th Cir. 2023) (scope of consent to search car for firearms extended to locations in the car where a gun

---

[1] The "probable cause" element could be relevant only in Hanson's case because it comes from an older version of A.R.S. § 8-821 in effect when L.G. was removed (March 13, 2018) but not when C.S. was removed (October 9, 2019). *Compare* A.R.S. § 8-821 (effective July 3, 2015 to June 30, 2018, and July 1, 2018, to August 2, 2018), *with* A.R.S. § 8-821 (August 3, 2018 to present).

[2] In their replies, Defendants briefly argue that probable cause existed. *See* Doc. 106 at 6:19–21; Doc. 107 at 10:12–13, 11:19–22. That is insufficient to form a basis for summary judgment. It is also unpersuasive at least in the Steins' case, as discussed below. *See infra* § II.A(xi).

might be concealed); *United States v. Lopez-Cruz*, 730 F.3d 803, 809 (9th Cir. 2013) (scope of consent to search phone did not extend to answering it). The core question is one of "objective reasonableness"—what a reasonable person would have understood by the exchange. *Jimeno*, 500 U.S. at 251.

Defendants assert that Plaintiffs consented to DCS removal of their children, and Plaintiffs assert they did not consent. The Court analyzes each family's dispute in turn.

**A. Steins v. Depke and Fregoso**

The following facts are drawn from the Steins' account because the Court is obliged to believe their evidence and draw all inferences in their favor at this stage. Where the Steins' account is ambiguous or missing information, the Court draws on undisputed facts or record evidence for clarity.

### i. C.S. attacks Justin, precipitating a family crisis.

On October 9, 2019, C.S. attacked his dad Justin, hitting Justin and attempting to choke him while Justin was driving. Doc. 96 at 15 ¶ 1. Justin almost lost control of the car. *Id.* When Justin and C.S. got home, Justin told his wife Jacqueline ("Jackie") what happened, and they agreed they needed help. *Id.* They called the Crisis Response Team ("CRT"), which sent Caren Jablonsky. Doc. 96 at 16 ¶¶ 3, 4. When Jablonsky arrived, the Steins explained their situation and discussed their options through "waves of tears." Doc. 96-3 at 14, 15; *see also* Doc. 96-2 at 38. The Steins were eager to get a psychiatric evaluation and medication for C.S., and potentially in-home respite care. Doc. 96 at 16 ¶ 2; Doc. 96-2 at 38. Jablonsky recommended the Steins call the DCS Hotline because there was "a good possibility" that DCS would be able to provide those things faster than any alternative. Doc. 96-3 at 18; *see also* Doc. 96 at 16 ¶¶ 5, 6; Doc. 96-2 at 39.

### ii. Jackie initiates a call to DCS, then turns the call over to Jablonsky.

Following Jablonsky's advice, the Steins chose Jackie to call the DCS Hotline because she was "more calm [than Justin]." Doc. 96-3 at 15. She began the call saying:

> I have the Crisis Mobile Team here at my house right now about my son. And he's disabled and he's got severe autism. And he's in the last month been increasingly violent towards himself and others. And we can't, we're, we're

- 5 -

living in danger. Our family, we're scared. We can't handle him. He, he attacked my husband today in the car and they almost got in a car accident, a very bad one. And we are physically unable to take care of him. We need, we need help today. I'm, I'm afraid to even transport him anywhere because of what happened in the car today with my husband.

Doc. 91-1 at 189–90. At this point, Jackie became distraught and Jablonsky took over the call. *See* Doc. 91-1 at 190, 198. Jablonsky said, "You know what? Maybe it would be easier for me to be reporting [rather than Jackie]." *Id.*

### iii.  Jablonsky tells DCS that the Steins want C.S. removed.

A sort of "game of telephone" followed. Jablonsky stepped outside, *see* Doc. 91-1 at 191:14–18, and explained the situation as she saw it. Her view evolved and became more emphatic over the course of the call. First, she repeated Jackie's description of events and said:

[These two parents] are, you know, trying to put additional services in place as soon as they can, but as of right now the parents are feeling that they and their daughter are in imminent danger because of the uncontrolled behaviors of [C.S] and they are extremely exhausted.

I mean I, I would have to say that this child is at risk for some level of neglect because of the severe burnout on both of the parents' parts.

Doc. 91-1 at 195–96. Shortly after, Jablonsky said, "Well, they, they're essentially saying they want their son to be removed from their home." *Id.* at 197. Finally, after the DCS agent asked to speak to Jackie, Jablonsky said,

Well, and I can put [Jackie] back on the phone so she can say it to you, but now I'm the reporter. So, but that is what I'm being told directly from both parents, that they are unwilling to care for their child and they need him to be removed today if possible. That's what we're hearing.

*Id.* The DCS agent "check[ed] something for a moment … to make sure [she didn't] have to hear [the removal request] from [Jackie]," then confirmed "it seems like it should be fine coming from [Jablonsky]." *Id.*

The DCS Hotline summarized the call with Jackie and Jablonsky in a "Narrative for Communication" (the "Hotline Report"). Doc. 91-1 at 205. The Hotline Report characterized Jablonsky's last, more emphatic characterization of the Steins' wishes:

- 6 -

> The parents have expressed they want [C.S] permanently removed from the home, today. They are in fear of him and feel they, and [their daughter], are at risk with [C.S.] in the home. The parents "are exhausted" from trying to care for [C.S.], putting him at risk of neglect due to the severe burnout of the parents. Mother was spoken with an[d] agreed, they want him removed.

*Id.* The Hotline Report was in turn assigned to DCS agent Alyssa Depke, who reviewed it and spoke with Jablonsky and two others associated with the Steins' case. Doc. 91-1 at 204; Doc. 96 at 9–10 ¶ 12 ("Undisputed[.]").  Depke and Fregoso then visited the Steins' home. Doc. 96 at 16 ¶¶ 7, 16.

### iv. Depke seeks the Steins' consent to removal while saying DCS was "taking [C.S.] no matter what" and "there was no turning back."

When Depke arrived, the Steins told her they wanted C.S. to receive a psychiatric evaluation, medication, and in-home respite care. Doc. 96 ¶¶ 2, 7, 13. Depke replied that DCS and its employees are not "babysitters," and asked if a family member could take C.S. Doc. 96 ¶¶ 8, 10, 26. Depke did not explain that DCS would be obligated to take custody if the Steins were unable to make other arrangements. Doc. 96 at 17 ¶ 11. When the Steins said that no additional family was available, Depke presented two "Temporary Custody Notices" ("TCNs") to the Steins for signature. Doc. 96 at 17 ¶ 15. When Depke presented the TCNs, she did not give the Steins a copy of the DCS "Notice of Duty to Inform" or the "Guide to Department of Child Safety" documents, which are required under DCS policy and are intended to help parents understand the consequences of consenting to temporary custody. Doc. 96 at 17 ¶ 18. Depke did not tell the Steins that signing the TCN would result in DCS filing "a case against them, that they would have to retain legal counsel, or that substantiation of any charges could jeopardize the Stein's ability to work in their chosen fields." Doc. 96 at 19 ¶ 28. Depke did not tell the Steins that temporary custody would mean the Steins would lose their authority to make decisions for C.S., and that their contact with C.S. would be limited and monitored by DCS. Doc. 96 ¶ 27. And Depke did not mention alternatives the Steins would have "immediately" accepted, including a Voluntary

Placement Agreement ("VPA"),[3] respite care, or Crisis Response Center resources such as psychological evaluation and medication. Doc. 96-7 ¶¶ 3–8.

The TCNs are two pages each. Doc. 91-1 at 259–60, 262–63. The first page has a section titled "Type of abuse or neglect requiring temporary custody: Select the circumstance(s) that most clearly describe the danger to the child(ren) and reason temporary custody is necessary." *Id.* This section on both TCNs is check-marked by the circumstance described as "The child is actively endangering self or others and the caregiver cannot or will not control the child's behavior or arrange or provide necessary care." *Id.* The next section on both TCNs is check-marked to show that "Parent or Guardian Consent" was "how temporary custody was obtained." *Id.* The other two authorization-for-custody options, titled "Court Authorized" and "Exigent Circumstances," are blank. *Id.* The next section states that "The Department of Child Safety (DCS) must: Return your child within 72 hours … unless DCS files a legal paper, called a petition, with Juvenile Court. If a petition is filed, your child will be kept in the temporary custody of DCS." *Id.* The second page of both forms explains that "This form is required by Arizona law … to notify the parent … when a child is removed from his/her custody and placed in temporary custody prior to filing a Dependency Petition or for medical examination." Doc. 91-1 at 260, 262. The forms also provide "Information for Parents" including "Your Rights: If a petition is filed, you have the right to have an attorney represent you. The Juvenile Court will appoint an attorney to represent you if you qualify financially." *Id.*

After Depke presented the TCNs, Justin read his and was concerned because the Steins wanted psychiatric evaluation, medication, and in-home respite care, "not that their son be taken away from them." Doc. 96 at 18 ¶ 20. He signed the TCN "only because he didn't believe he had a choice if he wanted his son to get the help he needed." Doc. 96 at 18 ¶ 23. Jackie also read her TCN and "tearfully" told Depke she didn't want to sign and asked if she could "sign it saying, signing under duress." Doc. 96 at 18 ¶¶ 22, 26. Depke

---

[3] The Court uses this term because it is standard in Arizona, *see* A.R.S. § 8-806(D), but other jurisdictions use "Voluntary Safety Plan" or "Voluntary Separation Agreement."

told Jackie she could not write in "signing under duress" and that "it would look bad" for the Steins if Jackie refused to sign. Doc. 96 at 18 ¶ 25. After signing the TCN, Jackie said she "didn't want to do this anymore" and told Depke, "[G]et out of my house." Doc. 96 at 18–19 ¶¶ 25, 26.[4] Depke refused and said "she was taking [C.S], no matter what" and "there was no turning back." Doc. 96 at 18–19 ¶¶ 25, 26. DCS then took C.S. away. *See* Doc. 96 at 19 ¶ 27.

### v.  The Steins ask for C.S. to return home.

At noon on October 11, two days after DCS removed C.S., the Steins and Fregoso attended a Child Family Team ("CFT") meeting. Doc. 96 at 19 ¶ 29; Doc. 96-2 at 55.[5] There the Steins learned that C.S. had been evaluated and prescribed medication, and the Steins asked for C.S. to return home. Doc. 96 at 19 ¶ 29; Doc. 91-1 at 117 ("Parents offered

---

[4] The timing of Jackie's statement is disputed. Depke and Fregoso insist Jackie said "get out of my house" *before* signing the TCN, emphasizing precisely that concession in the Steins statement of facts. *See, e.g.*, Hr'g Tr. at 6:13–7:1 (citing Doc. 96 at 12 ¶ 16 ("Undisputed that Jackie signed the TCN after telling Depke to "get out of my house[.]")). The Steins insist Jackie signed the TCN *after* telling Depke to get out. Doc. 96 at 18 ¶ 25 ("After signing the [TCN] under duress, Jackie then said she "didn't want to do this anymore" and asked Depke to leave[.]"). In their reply, Depke and Fregoso also argue that the Steins' reliance on ¶ 25 is misplaced because "no facts [in ¶ 25] indicate *when* Jackie [said she 'didn't want to do this anymore' and 'get out of my house']." *Id.* The Court appreciates that the Steins inconsistently dispute when Jackie's statement was made. *Compare* Doc. 96 at 12 ¶ 16, *with* Doc. 96 at 18 ¶ 25. But ¶ 26 cites the same portion of the record as ¶ 25 and can be read consistently with ¶ 25: Jackie begins one paragraph saying, "And I remember after signing – I don't remember what the form was that I signed," Doc. 96-3 at 20:17–18, and begins the next saying, "*And then* I told her, I don't want to do this anymore … get out of my house." Doc. 96-3 at 21:2–3 (emphasis added). At least as a matter of inference at this stage, Jackie is entitled to claim that she signed before telling Depke to "get out." The Court is also inclined to grant the inference because it is ultimately immaterial to the Court's disposition, as discussed below. *See* § II.A.xiii.

[5] The Court notes two immaterial discrepancies between Depke's and Fregoso's agreement not to dispute Doc. 96 at 19 ¶ 29 and the record they provide. The Steins' paragraph 29 begins "On the following day," which in context means October 10. But Depke's and Fregoso's exhibits show the meeting in question took place on October 11. Doc. 91-1 at 116–17, 265–69. The Steins' paragraph 29 also refers to Depke, but only Fregoso appears to have been present at the October 11 meetings. *See id.* at 116, 269. Depke appears to have been present at a different meeting the day before. Doc. 91-1 at 112.

1  to take [C.S.] for medical evaluation and return home with behavior supports in the home

2  if medically cleared."). DCS was opposed. *See* Doc. 96 at 19 ¶ 29 ("Depke responded 'that

3  that [isn't] going to happen.'"); Doc. 91-1 at 117 ("DCS is not in agreement.").

### vi.  Depke and Fregoso tell the Juvenile Court the Steins do not want C.S. to return home.

Four hours after Fregoso attended the CFT meeting with the Steins, Depke and Fregoso filed a Dependency Petition in which they alleged that the Steins were "no longer willing to care for" their son and that the Steins had "asked DCS to take custody" of him. Doc. 96 at 19 ¶ 30; Doc. 91-2 at 21. The Dependency Petition did not mention that the Steins had, to the contrary, asked for C.S. back earlier that day. *See id.*

Three days later, on October 14, the Pima County Superior Court issued an *ex parte* order making C.S. a temporary ward of Arizona "based on the following fact[]: The mother and father are unwilling to care for [C.S.]."[6] Doc. 91-3 at 17. The Court further found "that it was reasonable to make no efforts to maintain the child in the home … based on the following fact[]: The parents are unwilling to care for the child[.]" *Id.*

 Two days after that, on October 16, Depke and Fregoso prepared a report to the Juvenile Court for the "Preliminary Hearing and/or Initial Dependency Hearing." Doc. 96 at 19 ¶ 31; Doc. 91-3 at 2–14. Like the Dependency Petition, the report omits that the Steins asked for C.S. back on October 11. *See id.* In a section titled "Description of dangerous conditions," the report provides a timeline reading "On October 9 … [the Steins] gave DCSS Depke consent to take custody of [C.S.]. On October 10 … [the Steins] refused to have C.S. return home. … On October 11 … it was determined that a Dependency Petition would need to be filed." Doc. 91-3 at 4. In the same section, describing the events of October 9, the report states "[the Steins] want [C.S.] permanently removed from the home, today." *Id.* at 2. This statement is repeated later as a general claim, without reference to October 9, as follows: "SIGNIFICANT: Parents asked for the child to be removed today." *Id.* at 4. In another section, "Efforts to implement the least intrusive plan," a form question

---

[6] The Order reads "based on the following facts" (plural) but lists only one fact.

asks, "Are the parents … willing for an in-home … safety plan to be implemented …?" and answers: "As to [the Steins]: NO." *Id.* at 6. In another section, "[W]hy continued temporary custody is necessary," the report states, "The mother and father are unwilling to care for [C.S.]." *Id.* at 7. In another section, "Services or support requested by … parent," the report states, "The parents requested respite care and an emergency psychological evaluation. This was arranged, but the parents refused to have [C.S.] back in the home." *Id.* at 12. In a passing reference to the October 11 meeting toward the end of the report, it states, "It was not until [C.S.] was at the CRC and [DCS] did not have a possible placement that [the Steins] stated that they would have [C.S.] home." *Id.* at 12–13.

### vii.  The Juvenile Court hears from the Steins and returns C.S. to them.

On October 17, the Steins attended the Preliminary Protective Hearing. *See* Doc. 106 at 12–13; Doc. 91-3 at 24. The Juvenile Court then ordered C.S. returned to the Steins. *See* Doc. 89 at 18; Doc. 91-3 at 26. The Juvenile Court "[could] not find probable cause to believe that continued temporary custody is clearly necessary." Doc. 91-3 at 26. DCS, however, continued to prosecute the dependency case for two more months, alleging neglect. Doc. 95 at 13 n. 2; Doc. 25 ¶ 59–60.

### viii.  Depke and Fregoso move for summary judgment on the judicial deception claim but fail to carry their burden.

Depke and Fregoso move for summary judgment on the Steins' judicial deception claim. To prevail on a judicial deception claim, a plaintiff must prove "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *David*, 38 F.4th at 801 (citing *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021)). Depke and Fregoso seek to carry their initial burden for summary judgment primarily by emphasizing that the Steins' statements before October 11 supported Depke's and Fregoso's conclusion that the Steins were unwilling to care for C.S. *See* Doc. 89 at 14–16; Doc. 106 at 11–13.

Ironically, Depke's and Fregoso's argument largely neglects the very fact they are accused of omitting before the Juvenile Court: that the Steins asked for C.S. back on October 11. The Steins' statements before October 11 are therefore not sufficient to carry

1    Depke's and Fregoso's burden of production. Even if Depke and Fregoso had carried their

2    initial burden, the Steins' evidence establishes a genuine dispute. In its temporary custody

3    order, the Juvenile Court based the order on a single fact: that the Steins were unwilling to

4    care for C.S. By neglecting to mention that the Steins had asked for C.S. back, Depke and

5    Fregoso omitted "the dispositive fact." Doc. 95 at 11. This is not, as counsel urged at oral

6    argument, a matter of DCS crediting a medical opinion over a parent's opinion. *See* Hr'g

7    Tr. 20:15–24:14. Instead, Depke and Fregoso credited their own conclusion that the Steins

8    did not want C.S. back over the Steins' statement that they did. That is sufficient to send

9    this claim to a jury to determine if Depke and Fregoso acted deliberately or with reckless

10   indifference. The Court notes the jury may also be called on to determine whether Depke

11   and Fregoso should face liability for their Preliminary Protective Hearing report, which

12   could also be materially misrepresentative despite the passing reference to October 11.

13        Depke and Fregoso also seek summary judgment on the basis that the Steins have

14   no evidence that Depke's and Fregoso's alleged misrepresentation was made deliberately

15   or with reckless disregard for the truth. As just mentioned, that is a question for the jury to

16   decide. But considering the facts in the light most favorable to the Steins, the Court adds

17   its disagreement here. The Steins' story is straightforward and consistent: they sought

18   services for C.S., consented to temporary removal only to the extent it could provide those

19   services, then asked for C.S. back when they learned C.S. had received those services. That

20   simple, consistent view of the facts defeats Depke's and Fregoso's argument that they did

21   not at least recklessly disregard the truth. The truth was that the Steins were *willing* and in

22   fact *asking* for C.S. back after achieving their goal for DCS involvement. In that context, a

23   jury could believe that telling the Juvenile Court that the Steins were unwilling to care for

24   C.S. shows at least a reckless disregard for the truth.

25        **ix. Depke and Fregoso move for summary judgment on the**
                   **unconstitutional removal claim.**

26

27        Depke and Fregoso argue that summary judgment on the unconstitutional removal

     claim is warranted because the Steins consented to C.S.'s removal. Doc. 89 at 11–14. To

28   show the Stein's consent, Depke and Fregoso rely primarily on the TCNs signed by the

1    Steins in Depke's presence. Doc. 89 at 9 (citing Doc. 90 ¶¶ 15–16); Hr'g Tr. at 3:22–23.
2    Depke and Fregoso also argue the Steins consent to C.S.'s removal is shown by context.
3    Citing Jablonsky's deposition, Depke and Fregoso emphasize that Jablonsky "discussed the
4    risks of calling DCS to their home, including the possibility that the Steins might
5    permanently lose custody of [C.S.]" Doc. 89 at 7 (citing Doc. 90 ¶ 10). Jablonsky also
6    recommended the Steins pack a bag for C.S., "which they did, putting in several days' worth
7    of clothing, diapers, and other necessities." Doc. 89 at 7. And Depke and Fregoso observe
8    that, after signing the TCNs, the Steins walked C.S. outside with the bag for transport to a
9    foster home. Doc. 90 ¶ 17.

10         Depke and Fregoso also argue the Steins never withdrew their consent to C.S.'s
11   removal. First, Justin Stein's deposition implies that he never withdrew consent. Doc. 89 at
12   12 (citing Doc. 90 ¶ 15). Second, Depke and Fregoso acknowledge that Jackie said "I don't
13   want to do this anymore" and told Depke to "get out of [the Stein's] house," but dispute
14   that Jackie made those remarks *after* signing the TCNs. Doc. 89 at 8–9, 11–12; *see also*
15   *supra* n. 4. According to Depke and Fregoso, Jackie's statements could not withdraw the
16   TCNs' consent because they preceded it. *Id.*; Doc. 106 at 3, 9. Depke and Fregoso contend
17   that, despite initial reservations, Jackie ultimately signed the TCN because the Stein's "were
18   desperate for help." Doc. 90 ¶ 16. Depke's and Fregoso's proffered evidence is sufficient to
19   carry their initial burden of production.

20                    **x.  The summary judgment burden shifts to the Steins.**

21         The Steins respond that material issues remain as to whether they consented to C.S.'s
22   removal and, even if they did, whether that consent was withdrawn. Doc. 95 at 1, 5–7. First,
23   they argue that they were coerced into signing the TCNs. Doc. 95 at 6 (citing Justin's mixed
24   feelings and Jackie's request to write in "signing under duress"). Second, the Steins argue
25   that they did not fully understand what they were agreeing to when they signed the TCNs.
26   *Id.* (citing Depke's failure to provide basic information or alternatives). Finally, the Steins
27   argue that both parents' consent is needed for removal, and Jackie withdrew her consent
28   but was told it was too late to back out. *Id.* at 6–7 (citing Depke's statement that "there was

1   no turning back"). Throughout their response, the Steins emphasize that they wanted C.S.

2   to receive a psychiatric evaluation, medication, and in-home respite care, and they believed

3   DCS was going to provide those services. *See, e.g.*, Doc. 95 at 3.

4         **xi.  The Steins carry their burden.**

5         Accepting the Steins' evidence as true, as the Court must at this stage, a jury could

6   believe that Depke and Fregoso violated the Steins' constitutional rights. First, Depke and

7   Fregoso failed to secure the Steins' consent because it was not "voluntary." Voluntariness

8   takes account of "the possibly vulnerable subjective state of the person who consents."

9   *Bustamonte*, 412 U.S. at 229, 248–49. Ninth Circuit courts often consider five factors to

10  determine whether consent was voluntary: (1) whether defendant was in custody; (2) the

11  use of "coercive tactics" such as keeping guns drawn; (3) whether Miranda warnings were

12  given; (4) whether the defendant was notified that they had the right not to consent; and (5)

13  whether the defendant had been told a search warrant could be obtained. *Liberal v. Estrada*,

14  632 F.3d 1064, 1082–83 (9th Cir. 2011).[7] These factors are non-exhaustive. *U.S. v.*

15  *Soriano*, 361 F.3d 494, 502 (9th Cir. 2004). In *Soriano*, for example, the fact that officers

16  threatened to take away the plaintiff's children if she did not consent did not fit perfectly

17  under the second factor, but still "provide[d] the most serious basis for questioning the

18  voluntariness" of her consent. *Id.* Had "that threat remained unabated, [plaintiff's] consent

19  could properly be set aside as involuntary." *Id.* Under the fourth factor, knowledge of the

20  right to refuse is also "highly relevant." *Id.* at 504 (citing *United States v. Childs*, 944 F.2d

21  491, 496 (9th Cir. 1991) (consent voluntary where consent form clearly states that a person

22  may refuse to sign it)); *see also United States v. Mendenhall*, 446 U.S. 544, 558–59 (1980)

23

24  ──────────────────

    [7] As seen in this rule statement, Fourth Amendment consent-to-search cases fit the consent-

25  to-removal context imperfectly. The policy behind consent to removal is also different from
    consent to search. With searches, "[t]he community has a real interest in encouraging

26  consent, for the resulting search may yield necessary evidence for the solution and
    prosecution of a crime, evidence that may insure that a wholly innocent person is not

27  wrongly charged with a criminal offense." *Jimeno*, 500 U.S. at 252 (quoting *Bustmonte*,
    412 U.S. at 243). The community appears not to have a similar interest in encouraging

28  parents to consent to removal of their children absent exigent circumstances.

(consent voluntary where respondent told she was free to decline). Finally, "application of the fifth factor ... hinges on whether a suspect is informed about the [the alternative to consenting] in a threatening manner." *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000); *see also United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir. 1994) (threatening a defendant with a search warrant intimates that "withholding of consent would ultimately be futile").

Considering these precedents, at least Jackie's consent was involuntary. The Steins were in a vulnerable subjective state—"desperate" and "tearful[]"—following C.S.'s attack on Justin. Depke told Jackie she could not write in "signing under duress," and that it would "look bad" for the Steins if Jackie refused to sign. After Jackie said she "didn't want to do this anymore" and asked Depke to leave, Depke refused and said "she was taking [C.S.] no matter what, [a]nd there was no turning back." These facts fit within three of the five factors: (1) they are evidence of coercive tactics, (2) they are evidence that at least Jackie did not know she could refuse to consent, and (3) they are evidence of Depke telling the Steins that withholding consent was futile in a threatening manner. These facts are also evidence of an unabated threat. Wherever they fall in the Court's factor analysis, together they weigh heavily against the voluntariness of at least Jackie's consent.

Second, Depke and Fregoso failed to secure the Steins' consent because it was not "intelligently given." Accepting the Steins' evidence, Depke and Fregoso failed to explain the most basic details of consenting to temporary DCS custody. Of course, the Sixth Amendment "knowing and intelligent" consent standard does not apply in a Fourth Amendment context. *Bustamonte*, 412 U.S. at 236; Hr'g Tr. at 26:10–14. The practical realities and attendant policies are totally different. *Id.* But Fourth Amendment "specific" and "intelligent" consent requires more than a signature. The totality of the circumstances surrounding that signature matter. *See, e.g.*, *id.* at 227. When basic information is withheld—like that temporary DCS custody may become permanent, that the parent will no longer be able to make decisions for their child, or that an alternative like a VPA exists— the meaning of the signature is constricted. That said, some of the Steins' evidence fails to

create a genuine dispute. The Steins say they read the TCNs, which did provide some information. The TCNs told them that they could use a lawyer or apply to have one assigned to them, that DCS might file a "Dependency Petition," and that C.S. would remain in custody if DCS did. *See, e.g.*, Doc. 91-1 at 260. But the TCNs do not define "Dependency Petition" or "custody," or explain that the Steins would lose all ability to make decisions for C.S. The TCN form is also ambiguous, referring to itself as required "when a child is removed … prior to filing a Dependency Petition or for medical examination." Parents seeking a psychiatric examination could understand the disjunctive "or" to mean a Dependency Petition was not at issue given their purpose. Without more information about those and other aspects of temporary removal, the Steins could not have intelligently consented to it.

Third, even if the Steins did voluntarily and intelligently consent, Depke and Fregoso exceeded the scope of that consent. The "expressed objects" the Steins sought were a psychiatric evaluation, medication, and respite care for C.S. Jablonsky told the Steins that DCS could provide those services faster than any other alternative, so long as they agreed to C.S.'s temporary removal. *See* Doc. 96 at 17 ¶ 14. The Steins told Depke that was their goal, and the Court must infer that Depke knew it was their goal from her conversations with Jablonsky and others before going to the Steins' house. *See, e.g.*, Docs. 90, 96 ¶ 12. The Court must also infer Depke knew Jackie's initial statements to DCS of "needing help" evolved through Jablonsky's and the Hotline Report's characterizations into a demand for "permanent[] remov[al]." Seen in context, the Steins' consent was specific to the services they believed DCS was offering through temporary removal. Those services were the limit of their consent. To the extent temporary removal involves more—far more—than those services, it exceeded the scope of the Steins' consent.

Finally, Jackie withdrew her consent. Jackie said "I don't want to do this any more" and told Depke to "get out." Depke replied "there was no turning back." Whether Depke's remark came before or after Jackie signed the TCN is immaterial. Jackie was free to withdraw consent before or after signing. Depke was mistaken to tell Jackie she could not.

Besides, the Court must credit the Steins' version of events at this stage. A jury could believe that Jackie told Depke to "get out" after signing. Depke and Fregoso also argue that Jackie's withdrawal of consent was not "clearly verbalized." Doc. 89 at 12; *see also* Hr'g Tr. at 7:5–21. But Jackie was clear enough that Depke replied saying it was too late for Jackie to change her mind. Jackie's statements were also clear as a matter of drawing all inferences in the Steins' favor. Depke and Fregoso also argue that the Steins fail to analyze the facts. Doc. 89 at 12 (citing *United States v. Kubbo*, 17 F. App'x 543, 545 (9th Cir. 2001)). But *Kubbo* involved a withdrawal of consent that fell "far short of an unequivocal act or statement of withdrawal" such as in this case, 17 F. App'x at 545, and the Steins do sufficiently analyze the facts that justify Jackie's withdrawal of consent. Doc. 95 at 6. Finally, Depke and Fregoso argue that some aspects of the record conflict with Jackie's account. Doc. 90 ¶ 16 (citing Justin's and Jackie's testimony). Those apparent conflicts go to credibility determinations and weight of the evidence, which are not the Court's province. A jury could believe that Jackie withdrew consent after signing the TCN despite the apparent testimonial conflicts.

Depke and Fregoso raise several unpersuasive objections. First, they imply the Steins' consented to removal to avoid being "in a worse pickle" if DCS initiated removal proceedings under probable cause. Doc. 89 at 12–13.[8] They cite *Dupuy v. Samuels*, 465 F.3d 757 (7th Cir. 2006), and other cases for the proposition that "the removing officer may properly overcome [parental objection] by explaining that s/he will seek a court authorized removal if consent is denied." Doc. 89 at 12–13. Depke and Fregoso expand on this rule, quoting from Judge Posner that consenting for lack of better alternative is still valid consent. *Id.* at 13. In *Dupuy*, Judge Posner discussed Illinois' practice of offering parents suspected of neglect or abuse the option of agreeing to "safety plans" involving restrictions short of removal. 465 F.3d at 761. Judge Posner reasoned that parents who consent to a

---

[8] In their reply, Depke and Fregoso more explicitly make this initially implied argument. Doc. 106 at 6–7. There, they assert for the first time that "Depke could easily have used the information she had gathered to ask a court to find probable cause[.]" *Id.* at 6. The Court understands this as an assertion that a court could have found probable cause.

safety plan to avoid the "worse pickle" of dependency proceedings going against them merely confront "a dilemma inherent in any settlement process." *Id.* Depke and Fregoso never apply this reasoning to the facts. Instead, they simply state without explanation that Jackie signed after objecting because she was told "it would be worse" and the Steins "might not get C.S. back" if Jackie did not sign. *Id.* As noted above, that is not sufficient to carry the initial burden for summary judgment. It also renders subsequent "consent" coerced and involuntary. And it is inaccurate. According to the Steins, Jackie objected *after* signing the TCN, not before. And even if she had objected before signing, *Dupuy*'s reasoning does not apply. Depke told Jackie not signing "would look bad," and "there was no turning back and [the Steins] might not get [C.S.] back." Doc. 96 at 18 ¶¶ 24, 26. That is hardly the same as offering parents suspected of abuse or neglect an option short of removal. Depke's statements were ominously vague, not clearly an "expla[nation] that [Depke would] seek a court authorized removal if consent [was] denied." *See* 465 F.3d at 761.

The Court disagrees with the implication that Depke could easily have gotten a court order to remove C.S. At oral argument, Depke and Fregoso conceded there were no exigent circumstances. Hr'g Tr. at 3:18–19. Depke also affirmatively stated that she was "concerned" but that there were "no apparent exigent circumstances" when she presented the TCNs to the Steins. Doc. 91-1 at 246–47. The Steins' signed TCNs with "Exigent Circumstances" box left unchecked. Doc. 91-1 at 259, 262.  And the information Depke gathered is disputed and susceptible to competing interpretations. Depke and Fregoso cite several sources to argue the Steins were essentially threatening to abandon C.S. Doc. 90 ¶ 11 (citing, among others, Doc. 91-1 at 189–90). But seen in context, these same sources could instead show the Steins were exhausted and expressing themselves dramatically to convey the urgency of their need, not that they intended to abandon C.S. Jackie's initial statements to DCS were clearly amplified and made more emphatic through Jablonsky's interpretation and the Hotline Report's characterization. Depke and Fregoso also cite several sources to argue that the Steins were threatening to neglect C.S. by refusing to drive

1    him anywhere and by keeping him in his room unattended during outbursts. Doc. 90 ¶¶ 12,

2    13. Again, in context of several other sources, the Steins approach could show their care

3    for and attention to C.S. *See, e.g.*, Doc. 96-2 at 18–19 (the Steins were advised by

4    professionals to close C.S. in his room during outbursts, never locked the door, and kept

5    an eye on C.S. using baby monitors); Doc. 96-3 at 7 (C.S.'s room was a "therapy room"

6    designed like one at a professional facility to reduce sensory overload).

7         Notwithstanding these evidentiary conflicts, Depke and Fregoso conclude that the

8    "undisputed facts show that Jackie consented both to avoid the negative effects of a court

9    order and to ensure that COS received immediate services." Doc. 106 at 6–7. But the facts

10   surrounding at least Jackie's consent and motivation are substantially disputed. For

11   example, the parties do not agree whether their discussion of a family member taking C.S.

12   for a few days, Doc. 96 at 16 ¶ 10, was a discussion of a VPA like the one in *Dupuy*. Doc.

13   106 at 6 (citing Doc. 90 ¶ 14 (no mention of VPAs); *see also* Doc. 96 at 17 ¶ 11 ("Depke

14   never informed the Steins that DCS would have to take temporary custody of their son if

15   the Steins were unable to make other arrangements"); Doc. 96-7 ¶ 5 ("Depke never brought

16   up the option of a [VPA] with us."). And as discussed in the preceding paragraph, the

17   likelihood of a court order is unclear given the conflicting accounts and competing

18   interpretations. Viewing the facts and drawing all inferences for the Steins, a jury could

19   believe Depke and Fregoso did not have probable cause to remove C.S. The parties' dispute,

20   as with so much of this case, is a question of fact for the jury to resolve. *See McKenzie v.*

21   *Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984).

22        Depke and Fregoso also argue that at least Justin's unconstitutional removal claim

23   should be dismissed because Justin did not withdraw consent. Doc. 89 at 12. Although

24   Arizona law may permit removal with consent of just one parent, *see* A.R.S. § 8-821,

25   federal constitutional law does not, at least when both parents are present. *See Smith v. City*

26   *of Santa Clara*, 876 F.3d 987, 990 (9th Cir. 2017) (citing *Georgia v. Randolph*, 547 U.S.

27   103, 120 (2006)) (consent of both occupants with apparent common authority required for

28   reasonable search); Doc. 95 at 7 (making this argument). Depke's and Fregoso's reply does

not respond to this argument, which the Court understands as a concession. *See generally* Doc. 106; *see also* Hr'g Tr. at 10:4–15 (focusing on Arizona law). The Court notes that federal law only creates a cause of action for that occupant whose consent is withheld. *See Smith*, 876 F.3d at 990. But a jury could infer that Jackie was speaking for both Steins throughout her encounter with Depke, such that Justin's consent was withheld to the same extent as Jackie's, and never secured for the same reasons as Jackie's. *See* Hr'g Tr. at 48:8–14. And, as discussed above, Justin's was never secured in any event because it was not voluntary or intelligently given, or at least its scope was exceeded.

Depke and Fregoso also cite several mostly out-of-circuit cases for the proposition that "courts often grant summary judgment on … effective consent before removing children" as a matter of law. Doc. 106 at 4 (citing *Smith v. Williams-Ash*, 520 F.3d 596, 600 (6th Cir. 2008) (summary judgment warranted where nonmovant did not withdraw consent to a VPA that could be revoked at any time); *Teets v. Cuyahoga Cnty., Ohio*, 460 F. App'x 498, 503 (6th Cir. 2012) (same plus "fe[eling] coerced … alone is not enough to establish that the safety plan was involuntary"); *Fisher v. Gordon*, 782 F. App'x 418, 424 (6th Cir. 2019) (same); *Sangraal v. City & Cnty. of San Francisco*, 2013 WL 3187384 at *11 (N.D. Cal. June 21, 2013) (same because VPAs are voluntary and the only threat was to initiate removal proceedings under valid exigency), *aff'd sub nom. Jones v. City & Cnty. of San Francisco*, 621 F. App'x 437 (9th Cir. 2015)). These cases are different from this case. Unlike a VPA, which parents can withdraw from at any time, here the Steins set in motion dependency petition proceedings from which they could not withdraw. The Steins would have agreed to a VPA "immediately" if they had been told about it. They were not. And unlike the cases Depke and Fregoso cite, in this case Depke did not threaten to initiate removal proceedings under a valid exigency. Depke's vague statements that it would be "worse" not to sign and that DCS was taking C.S. "no matter what" did not clearly refer to removal proceedings, and in any event no exigency existed.

### xii.   Depke and Fregoso unpersuasively move to dismiss the unconstitutional removal claim as to Fregoso.

In their reply, Depke and Fregoso argue for the first time that the Court should

dismiss Fregoso from the unconstitutional removal claims because the Steins allege Fregoso was never in their house. The Court previously found the Steins stated a claim for unconstitutional removal against both Depke and Fregoso. Doc. 34 at 12–14. Both Depke and Fregoso were implicated by, for example, allegations that Depke and Fregoso were together during the events that called parental consent into question. *See id.* at 13 (citing Doc. 25 at 16 ¶ 44) (Depke "later returned with DCS Supervisor Fregoso to initiate removal proceedings"). In their response to Depke's and Fregoso's motion for summary judgment, the Steins state that Fregoso was present but was never in their home and waited outside while Depke interacted with the Steins. Doc. 95 at 3 n.1 (citing Doc. 96 ¶ 16). In reply, Depke and Fregoso seize on the Steins' statement and urge the Court to grant summary judgment for Fregoso on Count One because a "supervisor may be liable under § 1983 only if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Doc. 106 at 9–10 (citing *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001), *overruled on other grounds*, *U.S. v. King*, 687 F.3d 1189 (9th Cir. 2012) (per curiam)).

Depke and Fregoso are correct that Fregoso is only liable for Depke's violations if Fregoso "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor*, 880 F.2d at 1045; *see also Ortez v. Washington Cnty.*, 88 F.3d 804, 809 (9th Cir. 1996); *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991)). But Depke and Fregoso did not assert that argument as a basis for their motion for summary judgment. *See generally* Doc. 89. To credit the argument from their reply brief would prejudice the Steins by depriving them of a meaningful opportunity to address it. *See, e.g.*, *Evans v. ZB, N.A.*, 2020 WL 6526245, at *2 (E.D. Cal. Nov. 5, 2020); *see also* LR Civ. 7.2(b) (motions shall set forth the points and authorities relied upon in support of the motion). The argument also is not particularly persuasive. The fact that Fregoso was never inside the Stein's home does not mean that Fregoso did not (1) direct Depke to act as she did, (2) set in motion a series of events that would cause Depke to act as she did, or (3)

1    know what Depke was about to do or had done and failed to stop or correct her. Thus, even
2    if Depke and Fregoso had legitimately asserted Fregoso's physical absence inside the
3    Steins' home as a basis for summary judgment, that fact is not dispositive.[9]

4         In conclusion, the Steins have carried their burden of establishing genuine issues for
5    trial regarding their consent to C.S.'s removal. Viewing the facts in their favor, a jury could
6    believe that Depke and Fregoso violated their constitutional rights. Therefore, Depke and
7    Fregoso are not entitled to summary judgment unless qualified immunity shields them.[10]

8         **xiii.  The coercive aspects of the Steins' account defeats Depke's and
9         Fregoso's assertion of qualified immunity.**

10        Depke and Fregoso assert immunity from liability for unconstitutional removal,
11   arguing that a reasonable official under the circumstances could not have known that the
12   Steins' consent was never secured or at least was limited. Doc. 89 at 13–14.[11] The Court
13   has just discussed the first prong in the qualified immunity analysis: whether there was a
14   constitutional violation. For purposes of qualified immunity, and based on the discussion
15   above, the Court finds that there was.

---

16   [9] To the extent the Steins' response "raised the issue" and the Court has discretion to
17   consider it, the Court declines to exercise that discretion. *Cf. Ellingson v. Burlington N.,*
18   *Inc.*, 653 F.2d 1327, 1332 (9th Cir. 1981) ("This court may consider the issue when … the
     issue has been fully explored. *Greyhound Corp. v. Blakley*, 262 F.2d 401, at 407–08 (9th
19   Cir. 1958). This is not the case here.").
20   [10] In the last sentence of their introduction, Depke and Fregoso also assert the Steins cannot
     demonstrate Depke's and Fregoso's behavior "shocks the conscience." Doc. 89 at 2–3
21   (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Depke and Fregoso do
     not subsequently develop this argument. *See generally* Docs. 89, 106. They have thus failed
22   to carry the initial burden of production. Even if they had not, the standard they identify
23   relates to substantive due process violations and does not bear on the Fourth Amendment
     issues discussed above. *Cf., e.g., Lewis*, 523 U.S. at 846 ("Substantive due process analysis
24   is … inappropriate in this case only if respondents' claim is "covered by" the Fourth
     Amendment. It is not."); *see also* Hr'g Tr. at 26:6–8.
25   [11] Depke and Fregoso assert qualified immunity for the unconstitutional removal claim, not
26   the judicial deception claim. *See* Doc. 89 at 14–18 (judicial deception section). Even if they
     had, the Steins are correct that governmental employees are not entitled to qualified
27   immunity on judicial deception claims. Doc. 95 at 13 (citing *Hervey v. Estes*, 65 F.3d 784,
28   788 (9th Cir. 1995)); *see also Chism v. Washington State*, 661 F.3d 380, 393, 393 n. 15
     (9th Cir. 2011).

The second prong in the Court's qualified immunity analysis requires it to determine whether the law prohibiting Depke's and Fregoso's conduct was "clearly established" at the time. "Clearly established" precedent requires "a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) (citation omitted). The precedent need not be "directly on point," but must be sufficiently similar to place an action's lawfulness "beyond debate." *See id.* (citation omitted). The plaintiff bears the burden of identifying settled law that clearly applies to the official's specific circumstances. *Schafer v. Cnty. Of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017). The Steins first argue that genuine issues of material fact preclude qualified immunity here. Doc. 95 at 8 (citing *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014); *Fisher v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000)); *see also* Doc. 110 (citing *Jerger v. Blaize*, 41 F.3d 910 (7th Cir. 2022)). The Court agrees because qualified immunity depends on which facts and inferences a jury accepts.

The right of families to live together without government interference is well-established. *See Demaree*, 887 F.3d at 873. The government may not interfere without a court order, consent, or under exigent circumstances. *See David*, 38 F.4th at 803; A.R.S. §§ 8-821(A)(1)–(3), (D). Where the legal question—here, consent—turns on resolution of disputed fact issues, a jury must determine liability. *See Tolan*, 572 U.S. at 656–57; *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168 (9th Cir. 2013) ("[I]t sometimes proves necessary for a jury to determine … whether [an official's] mistake was, in fact, reasonable.") (citing *Santos v. Gates*, 287 F.3d 846, 855 n. 12 (9th Cir. 2002) ("[W]hether the officers may be said to have made a "reasonable mistake" of fact or law, … may depend on the jury's resolution of disputed facts and the inferences it draws therefrom. Until the jury makes those decisions, we cannot know, for example, how much force was used, and, thus, whether a reasonable officer could have mistakenly believed that the use of that degree of force was lawful.")); *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1038–39 (9th Cir. 1996) (holding that foundational, disputed facts must be determined by the jury before qualified immunity claim can be resolved); *see also Jerger*, 41 F.4th at 915

("Summary judgment is not available in the face of this factual tug-of-war. Nor is qualified immunity where the parties dispute facts material to the consent question."); *Fisher*, 234 F.3d at 317 ("Where, as here, the legal question of qualified immunity turns upon which version of facts one accepts, the jury, not the judge, must determine liability.") (citation omitted); *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (objective reasonableness standard permits courts to "resolve questions of reasonableness on summary judgment ... *where the material facts are not in dispute* ...") (emphasis added); *de Abadia v. Izquierdo Mora*, 792 F.2d 1187, 1190 (1st Cir. 1986) ("Obviously if there was a determining question of fact regarding defendant's qualified immunity defense, denial of the motion [for summary judgment] was correct.").

Two cases in particular stand out. In *Tolan*, the Court reversed an affirmed grant of summary judgment on qualified immunity grounds for failure "to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" 572 U.S. at 651 (citing *Liberty Lobby*, 477 U.S. at 255). The Court emphasized that

> under either [qualified-immunity] prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.

*Id.* at 656 (citations and quotations omitted). Similarly, in *Jerger* the Seventh Circuit considered "a messy set of facts arising out of a child welfare investigation," 41 F.4th at 911, where "the only issue … [was] consent." *Id.* at 914. Under the Jerger family's version of the facts, "[a] reasonable jury … could find that the DCS case workers employed coercion [to secure consent.]" *Id.* The *Jerger* court reversed summary judgment based on qualified immunity for DCS agents, holding that the "mess of facts concerning the Jergers' consent … precludes a ruling on qualified immunity … [until] the jury's ultimate resolution of the facts[.]" *Id.* at 915. *Tolan*'s and *Jerger*'s reasoning are particularly powerful in the Steins' case, where the scope and nature of the Steins' consent depends on the totality of

the circumstances and is genuinely disputed. If the jury accepts the Steins' version of the facts, Depke's belief that she had secured valid consent was objectively unreasonable at least from the time Depke said "there [is] no turning back."

The Steins cite several cases providing sufficient notice to defeat Depke's and Fregoso's assertion of qualified immunity under the Steins' version of the facts. First, all reasonable officials would know that the Steins were vulnerable to DCS's power and would not understand their right to withhold or withdraw consent given Depke's statements. The Steins cite *LaDuke v. Nelson*, 762 F.2d 1318, 1329 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986). Doc. 95 at 6. In *LaDuke*, the court affirmed a finding of involuntary consent where, among other things, migrant farmworker plaintiffs were not advised that they had the right to refuse an Immigration and Naturalization Services ("INS") search and were vulnerable to an official show of force due to their "knowledge of the 'power which INS has in dealing with them[.]'" 796 F.2d at 1330. That context persuaded the court to agree that "the record demonstrates 'no more than acquiescence to a claim of lawful authority.'" *Id.* at 1329. The court also identified a wide range of cases to support the district court's factors, including *Bustamonte*, 412 U.S. at 243 (failure to inform of right to refuse consent probative on voluntariness), *United States v. Marshall*, 488 F.2d 1169, 1187–89 (9th Cir. 1973) (show of force by armed officers; display of authority), and *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968) ("[T]he record demonstrates 'no more than acquiescence to a claim of lawful authority.'").

*LaDuke* and the cases it cites put Depke and Fregoso on notice that a failure to inform the Steins of their right to withhold consent rendered that consent involuntary, particularly given Depke's statements that resistance was futile. As in *LaDuke*, here Depke and Fregoso appeared as authority figures. In *LaDuke*, the authority figures represented INS, and the plaintiffs were migrant farm workers. 762 F.2d at 1329. Here, Depke and Fregoso represented DCS, an organization commonly—and in this case specifically, *see* Doc. 91-1 at 33—associated with taking children away from their parents. On that basis, Depke and Fregoso knew that the Steins—and parents generally—were aware of "the

power which [DCS] has in dealing with them." When Jackie said she did not want to sign the TCN, Depke told her that not signing "would look bad." After Jackie said she "didn't want to do this anymore" and told Depke to "get out," Depke said DCS "was taking [C.S], no matter what," and that "there was no turning back." As discussed above, and drawing all inferences for the Steins, those statements could have come across as "a claim of lawful authority." In that context, all reasonable officials would know that the Steins apparent consent through the TCN was not voluntary, but rather mere "acquiescence."

Second, all reasonable officials would know that the Steins' lack of objection after Depke said "there was no turning back" does not imply consent. The Steins cite *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990). Doc. 95 at 5. As here, in *Shaibu* the government relied entirely on consent for the legality of an entry and search. 920 F.2d at 1426. Observing that "free and voluntary consent cannot be found by a showing of mere acquiescence to a claim of lawful authority," and that "[c]oercion is implicit in situations where consent is obtained under color of the badge," the *Shaibu* court held that failing to object to a police officer stepping through a partly open door "as more likely suggesting submission to authority than implied or voluntary consent." *Id.* at 1427. *Shaibu* also notified Depke and Fregoso that they could not simply rely on an absence of subsequent objection to an exercise of apparent authority after Depke said "there was no turning back." Though a closer question than with *LaDuke*, *Shaibu* defines Depke's and Fregoso's obligations at a sufficient level of particularity. A police officer executing a search acts similarly to a DCS agent executing a removal because both perform an essential and specialized task in their given role. A police officer inferring consent from a partly open door is similar to a DCS agent inferring consent from an equivocal request for removal because both situations are highly ambiguous, dynamic, and require evaluation of social cues. And a police officer continuing to infer consent from silence after stepping through the door is similar to a DCS agent continuing to infer consent from silence after proceeding with removal because both situations involve an occupant acquiescing to an authority figure's assumption of authority. *Shaibu* also clearly warns officials that because they may

not rely on equivocal consent, they also may not affirmatively tell the occupant that they have no choice or ability to withdraw consent. That is, by identifying the relative fragility of equivocal consent, *Shaibu* alerts all reasonable officials to the absolute fragility of consent given after statements like "there is no turning back." Having spoken "under the color of the badge" to blow past Jackie's objections, Depke and Fregoso are not protected by the Steins' subsequent silence or assistance walking C.S. to the DCS vehicle. All reasonable officials would know that.

Third, a reasonable official would know that both Jackie's and Justin's consent was required to remove C.S. The Steins cite *Georgia*, 547 U.S. at 120. In *Georgia*, a wife summoned the police to her home and alleged her husband took their son away after a domestic dispute. *Id.* at 107. The husband returned, disputed the wife's account, and each accused the other of using drugs and endangering their son. *Id.* The wife offered to show the police evidence incriminating her husband. *Id.* When the police sought consent to enter their home, the husband refused but the wife did not. *Id.* The Court held that under the totality of the circumstances, including an absence of exigent circumstances, "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him." *Id.* at 122. Emphasizing that the "constant element in assessing … reasonableness in the consent cases … is the great significance given to widely shared social expectations," the Court reasoned that "a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.'" *Id.* at 111, 113. That common-sense observation invites another: a reasonable DCS official would have no confidence that one parent's consent was a sufficiently good reason to remove a child when the other parent stood there saying "I don't want to do this anymore" and "get out of my house." More particularly, a reasonable official would understand from *Georgia* that whatever the Arizona statute appears to permit, the Constitution requires unequivocal consent to removal from both parents when both are present and no exigency exists. A reasonable official also would have noted that the moment the searching police officer in *Georgia* called the district

attorney's office, he was "instructed to stop the search and apply for a warrant." 547 U.S. at 107. That is because the failure to secure adequate consent was fairly obvious there, as it is here. *Cf., e.g.*, *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015) ("[T]he more obviously egregious the conduct in light of prevailing constitutional principles the less specificity is required from prior case law to clearly establish the violation.").

Depke's and Fregoso's cases are not binding on this Court and are not helpful to them in any event. In *Fisher v. Gordon*, for example, officials investigating allegations of a father's abuse gave parents the choice of whether the father or the daughter would leave the family home during the investigation. Doc. 89 at 14 (citing 782 F. App'x at 420). The officials believed they had secured consent when the mother said the daughter would leave, gathered the daughter's clothes, and did not state any objections to the removal. *Id.* That is different from this case, where Jackie told Depke to "get out" and Depke said "there is no turning back." And in *Smith* and *Dupuy*, the parents chose a VPA to avoid removal. Doc. 89 at 14 (citing *Smith*, 520 F.3d at 600; *Dupuy*, 465 F.3d at 761). That is different from this case, where the Steins would have "immediately" accepted a VPA and did not understand what removal meant.

For those reasons, Depke and Fregoso are not entitled to qualified immunity. The Steins' claim for unconstitutional removal, like their claim for judicial deception, raises questions that only a jury can decide. The Court emphasizes, though, that its reasoning at the second qualified-immunity step is based on the coercive aspects of the Steins' account. The law on voluntary consent was clearly established when Depke and Fregoso removed C.S. By contrast, the law on informed consent and the scope of consent was not—at least not enough to place the issue "beyond debate." The Steins' cases demonstrate that point— only the coercion cases like *LaDuke* and *Shaibu* are sufficiently particular to put Depke and Fregoso on notice that their conduct was objectively unreasonable. Thus, although the Steins' account passes the first step of the Court's qualified-immunity analysis for several reasons, it passes the second step only because the Steins' consent was involuntary under

1   clearly established law.

2      **B.  Reid v. Hanson**

3      The following facts are drawn from Reid's account because the Court is obliged to

4   believe Reid's evidence and draw all inferences in her favor at this stage. Where Reid's

5   account is ambiguous or missing helpful orienting information, the Court draws on

6   undisputed facts or record evidence for clarity.

7      **i.  L.G.'s long-time behavioral issues lead to a 2017 VPA.**

8      L.G. was born in 2007, and has two sisters: G.G., born in 2005, and E.G., born in

9   2010. Doc. 85-1 at 7; *see* Doc. 98 at 1 ¶ 1. L.G. has always been a "challenging child," with

10  significant behavioral issues since pre-school. Doc. 98 at 2 ¶ 3, 13 ¶ 1.

11      In early 2017, L.G.'s situation reached an inflection point. In January, L.G. became

12  angry about an incident at dinner and tied a cord around his throat, turning blue before his

13  stepfather found him. Doc. 86-2 at 17–18. In early February, Reid left the children's

14  stepfather and moved with her three children into a one-bedroom apartment. *See* Doc. 85-

15  2 at 11. On February 27, E.G. told Reid that she and G.G. "had sex" with L.G., which Reid

16  discovered meant L.G. coerced the girls, ages 7 and 12 at the time, into sexual contact. *See*

17  Doc. 98 at 3–4 ¶ 5; Doc. 85-2 at 10–11. Later that day, in an effort to keep the girls safe

18  and to relieve the cramped living situation, Reid sent L.G. to live with her sister and

19  brother-in-law temporarily. Doc. 85-2 at 12–13. That night, G.G. attempted to hang herself

20  with a shoelace—her second suicide attempt that year—ostensibly due to Reid and G.G.'s

21  stepfather's recent separation. *See* Doc. 98 at 3–4 ¶ 5; Doc. 86-2 at 15–16. The next week,

22  during a healthcare appointment for G.G., the provider learned of L.G.'s coercive sexual

23  behavior and reported it to DCS, who dispatched Hanson to investigate. Doc. 98 at 3–4 ¶

24  5; Doc. 85-2 at 17; Doc. 86-2 at 15. In Reid's words, "it was just a stressful time for

25  everybody." Doc. 85-2 at 11.

26      Hanson's investigation into L.G.'s February 2017 behavior ultimately resulted in a

27  letter to Reid that the provider's report of neglect was unsubstantiated. Doc. 98-3 at 16. But

28  Hanson also told Reid that further incidences between the children would result in them

being taken away, which made Reid afraid. Doc. 85-2 at 14. Reid was thus "terrified" two months later, in April, to learn Reid's sister and brother-in-law could no longer house L.G. Doc. 98 at 4 ¶ 6; Doc. 85-2 at 13–14, 17. L.G. had become a bad influence on his young cousin and had displayed "sexualized behaviors towards the dog." Doc. 85-2 at 13. Reid called Hanson for advice on L.G.'s imminent return, and Hanson advised her that L.G. could return but Reid would have to sleep in the same bed with him and monitor him "24/7, and there couldn't be any other incidences." Doc. 85-2 at 14–16. L.G. returned, and for the next week or two Reid attempted to care for him as Hanson had instructed. Reid "didn't sleep … didn't eat … [and] couldn't really work because [she] had to devote [her] whole existence to monitoring [L.G.]." Doc. 85-2 at 16. Reid talked to a counselor and social worker who told her, "[You] just have to call DCS and say you need more help. You can't do this. They have to help you[.]" *Id.*

Reid called DCS for help, and on May 8, 2017, Hanson initiated a 90-day VPA in which Reid retained custody of L.G. while he was removed from Reid's home and provided with psychological evaluation and care. Doc. 98 at 5 ¶ 8; Doc. 85-2 at 17. L.G. returned home in early August, but his behaviors did not improve. Doc. 98 at 6–7 ¶ 11.

**ii.  L.G. starts a fire, leading to his 2018 removal by DCS.**

In the early morning of March 12, 2018, before 7:00AM, L.G. started a fire in his bedroom. Doc. 98-2 at 13–14. Reid called the police, who took L.G. away. *Id.* Based on prior experience, Reid assumed that L.G. would be taken to a program called Alternative Community Engagement Services ("ACES"), and that she would be contacted when it was time for L.G. to return home. Doc. 98-2 at 17.

At 9:15AM, Reid called Hanson to ask what to do. Doc. 98 at 16 ¶ 27; Doc. 98-2 at 18. Reid told Hanson that L.G. was a threat to her and her daughters, and that L.G. needed additional services. Doc. 98-2 at 18–19. Hanson told Reid that "we couldn't do a [second VPA], and we needed to do a dependency for [L.G.] to get the services he needed." Doc. 98-2 at 20. Hanson told Reid that contacting DCS and seeking a dependency petition "was the course [Reid] had to go" if she wanted to get services for L.G. *See* Doc. 98-2 at 37, 41,

48. Hanson did not explain what a dependency was, or how it was different from the VPA where Reid had retained decision-making authority over L.G. Doc. 98-2 at 48–49. "All [Hanson] explained about a dependency [was] that [Hanson] was going to ensure that it was on the nonabuse and neglect category and that [L.G.] got the services he needed." Doc. 98-2 at 49. Reid knew that dependency proceedings entailed a risk of being labeled abusive and neglectful, which could jeopardize her employment, but did not realize dependency "entailed court … filing something in court … [or] getting a lawyer." Doc. 98-2 at 42–43.

At 9:20AM, Reid called the DCS Hotline. Doc. 98 at 16 ¶ 27; Doc. 98-2 at 21. Reid disputes some aspects of the call, but not that she asked DCS to remove L.G. *Compare* Doc. 86-2 at 21 (the hotline report of Reid's call stating that "[Reid] is demanding that [L.G.] be removed from her home by DCS today."), *with* Doc. 98-2 at 20–41 (disputing other aspects of the report).[12] While Reid was on the phone with DCS, ACES called her and left a message asking about picking up L.G. Doc. 98 at 16 ¶ 27; Doc. 98-2 at 29.

At 10:08AM, Reid called Hanson again, told him about the ACES call, and asked what she should do. Doc. 98 at 16–17 ¶¶ 27, 28; Doc. 98-2 at 29. Hanson explained "that he was assigned to the case, and he was going to be picking up [L.G.] up from ACES." Doc. 98-2 at 29, 33. Reid did not object. Doc. 98-2 at 30, 48; *see also* Doc. 85-3 at 13–15.

At 10:17AM, Reid called ACES back, explained that Hanson would pick L.G. the following day, and provided Hanson's phone number. Doc. 98 at 16–17 ¶¶ 27, 28; Doc. 98-2 at 31.

At 3:12PM, Reid and Hanson signed a "Notice of Duty to Inform." Doc. 98 at 8–9 ¶ 13 ("Undisputed."); Doc. 87-1 at 18. The Notice states that "[t]he following allegation concerning your child … is currently being investigated by DCS[:] Neglect." *Id.* The Notice also provides information about the investigatory process and Reid's rights. *See id.* The Notice concludes, "More information about DCS and your parental rights are outlined in the pamphlet, 'Guide to Department of Child Safety,' that I am leaving with you today." *Id.* Reid's and Hanson's signatures appear under the statement that "[b]y signing this form,

---

[12] Unlike in the Steins' case, in Reid's case there is no transcript of her DCS Hotline call.

1    you are acknowledging that I have reviewed the information contained in this notice with

2    you." *Id.*

3         The following day, March 13, at 7:05AM, Hanson called Reid and spoke to her for

4    five minutes. Doc. 98-2 at 34. At 9:35AM, Hanson called again and spoke to Reid for ten

5    minutes. *See id.*; Doc. 98-3 at 21. There is no evidence of what Hanson said on these calls,

6    but Reid remembers Hanson did not tell her that he was taking custody of L.G., what

7    "custody" meant, or that he was filling out a TCN. *See* Doc. 98-2 at 34, 44, 64. Hanson just

8    "said he was picking up [Reid's] son, and [Reid] said okay." Doc. 98-2 at 45. The TCN in

9    question is filled out stating that DCS took custody of L.G. at 7:45AM on March 13. Doc.

10   88-1 at 2. It further states that Hanson served Reid "Verbal … telephonic" notice of the

11   TCN at 8:30AM. *Id.* The TCN further states that the "[t]ype of abuse or neglect requiring

12   temporary custody" is "Abandonment." *Id.* The space provided for "Parent, Guardian or

13   Custodian's Signature" is blank. *Id.* Later that day, Hanson picked L.G. up from ACES and

14   took him to a group home. Doc. 97 at 3; *see* Doc. 98-2 at 29.

15       Two days later, on March 15, Reid attended a Team Decision-Making Meeting.

16   Doc. 98-2 at 34–35. There she saw the TCN for the first time, but Hanson still did not

17   explain it to her. Doc. 98-2 at 64. Hanson again told Reid that the only way to get L.G. the

18   services he needed was for DCS to file a dependency petition. Doc. 98-2 at 37. Reid did

19   not object to the dependency, but she did not understand what it meant or how it would

20   affect her. Doc. 98-2 at 38–40. Reid "knew that [DCS was] placing [L.G.], just like the

21   [VPA] where [DCS had [L.G.] out of [Reid's] house, but [DCS] didn't have custody of

22   [L.G.] [Reid] had no idea there was a difference. Nobody explained that to [her]." Doc. 98-

23   2 at 45.

24       Five days later, on March 20, Reid attended the Preliminary Protective Hearing. *See*

25   Doc. 98 at 11–12 ¶ 18; Doc. 98-2 at 51–53. There she learned that DCS was filing a

26   dependency petition, and what that meant. Doc. 98-2 at 50–51. In her words:

27       I was very confused about why I would have to go to court. I showed up. I
         had no idea I needed a lawyer. I had no idea of any of the proceedings until
28       it unfolded, and I was very shocked and surprised. … I [recall] showing up,

the judge was there, and they started getting me to fill out this paperwork about my income to figure out, you know, how much my lawyer was going to cost, and then I heard that [L.G.] had his own lawyer, and it was just, like, very confusing to me, because I had no understanding of what was going on and what was happening. And then I got a copy of the actual petition filed or – I don't know what that thing is called, but the thing that they put into court to start it. Right? And it's talking about that I possibly would be under abuse and neglect category, so then I'm very upset because James Hanson promised me that it wouldn't. But that's all I really remember, is being very confused and upset and distraught, shocked.

Doc. 98-2 at 51–53. DCS's dependency petition was successful, and L.G. remained in DCS custody for three and half years, during which time he lived as many as 19 places. Doc. 98-2 at 54–55.[13]

> ### iii. Even if Hanson violated Reid's constitutional rights, Hanson is entitled to qualified immunity because his actions were objectively reasonable and did not violate clearly established law.

Qualified immunity attaches if a constitutional right (1) was violated and (2) was "clearly established" at the time. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court has discretion to analyze either step first, *see id.* at 236, and is advised to "think hard, then think hard again" before analyzing both. *Wesby*, 138 S. Ct. at 589 n. 7 (citation omitted). Qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. An official performs their duties reasonably by avoiding "acts that have been clearly established as unconstitutional … as well as other, similar acts[.]" 724 F.3d at 1168 (citation omitted). These similar acts "must be sufficiently similar to place an action's lawfulness 'beyond debate.'" *See Wesby*, 138 S. Ct. at 590 (citation omitted). A reasonable official nonetheless "sometimes makes mistakes—reasonable mistakes—of fact or law,

---

[13] Reid does not allege that Hanson is responsible for the outcome of the dependency petition. *See, e.g.*, Hr'g Tr. at 40:21–41:3. Her claim is thus limited to the seven-day temporary custody preceding the dependency petition proceedings, as well as any "emotional distress to [Reid] [caused by the initial removal] beyond [the] date" of the dependency petition proceedings. *See* Hr'g Tr. at 41:4–11.

and thereby commits an unconstitutional act[.]" *Johnson*, 724 F.3d at 1168 (citation omitted). These reasonable mistakes are shielded. To determine whether an official's mistake was reasonable, the Court places a "familiar character, the hypothetical 'reasonable officer' …. in the same situation as the defendant [officials], and then ask[s] whether the reasonable [official] also would have committed" the contested act. *Id.* "If the answer is 'yes,' the defendant officers are entitled to qualified immunity." *Id.*

In the Steins' case, the Court was obliged to conduct both steps of the qualified immunity analysis to determine that a jury issue remains. Not so in Reid's case. Even assuming (without granting) that Hanson violated Reid's constitutional rights under her version of the facts, any mistakes he made were objectively reasonable and the relevant law was not clearly established.

### 1. Hanson's actions were objectively reasonable.

The Court first observes that a reasonable official could have believed that Reid wanted DCS to take custody of L.G. under Reid's version of the facts. This is not the rare case where a jury is required to decide whether a mistake was reasonable. *See Johnson*, 724 F.3d at 1168 (citation omitted). Hanson's is the more common case that qualified immunity is designed to protect.

The Court looks to the totality of the circumstances as they appeared to Hanson. Hanson knew L.G. and Reid. He was aware of the events leading up to the fire—L.G.'s life-long behavioral challenges, the cramped one-bedroom apartment, L.G.'s sexual contact with his sisters, and L.G.'s failed attempt to live with Reid's sister and his VPA. That was the context for Reid's call to Hanson the day of the fire. Hanson told Reid that a dependency petition was the only way Reid could get L.G. the services Reid wanted. Immediately after that conversation, Reid called DCS and asked for L.G.'s removal. Reid does not allege there was ever a discussion of L.G. returning home. In Reid's words:

> Q. Why did you call the police?
> A. [Reid] Because [L.G.'s] behavior had just gotten worse and worse and worse, and [the fire] was the last straw. He was now starting fires, which is an even bigger risk than what he had already been doing.

- 34 -

Doc. 98-2 at 15. Later, Reid says:

> Q. [On the day of the fire,] [w]hat did [DCS/Hanson] tell you would happen?
> A. [Reid] They didn't tell me what was going to happen.
> Q. [D]id you indicate to them that you were willing to have [L.G.] come back home?
> A. No.
> Q. What did you say to [DCS/Hanson] about [L.G.] coming home?
> A. I said it's a threat to the girls and I, so [L.G.] would not be able to come home.

Doc. 98-2 at 25–26.

Under the circumstances, a reasonable official could conclude that Reid asked for L.G.'s removal because she wanted DCS to take custody of L.G. As a DCS agent and Reid's case manager, Hanson was the natural instrument by which removal would be accomplished. In that context, a reasonable official could therefore reasonably—even if mistakenly—understand Reid's request for removal and lack of objection to Hanson picking L.G. up as consistent with her purpose of turning custody of L.G. over to DCS. That is particularly true because Reid did not subsequently object to DCS custody the afternoon she asked DCS to remove L.G., when she met with Hanson and signed a form saying Hanson gave her information about DCS's investigation of neglect and Reid's rights.[14] Reid also did not object two days later at the Team Decision-Making Meeting, or at any other time before the Preliminary Protective Hearing—and not even then.[15] Reid does not allege that she gave Hanson any reason to know that she did not understand the meaning of "custody," or that she did not intend DCS to take custody of L.G. when Hanson picked him up from ACES. Thus, even if Hanson was mistaken that Reid's consent to pick

---

[14] At oral argument, Hanson asserted the Notice as further evidence of Reid's consent. Hr'g Tr. at 30:4–32:2. That was not a basis identified in Hanson's Motion for Summary Judgment. *Compare* Doc. 84 ¶ 13 (the Notice), *with* Doc. 83 at 10 (MSJ citing Doc. 84 ¶¶ 12, 14–15 as evidence of consent). But the Notice is relevant under the totality of the circumstances to show that Reid had ample opportunity to understand what was happening and, under her version of the facts, never asked clarifying questions or raised objections.

[15] Reid's evidence does not suggest she asked for L.G. back at the Preliminary Protective Hearing, only that she was shocked to learn L.G. had his own lawyer and she would need one also. *See* Doc. Doc. 98-2 at 51–53. Reid does not claim she ever asked for L.G. back, or that she protested to Hanson at any point after Hanson picked L.G. up from ACES.

1   up L.G. was not also consent to DCS taking custody of L.G., that mistake was objectively

2   reasonable.

3   **2.  No clearly established law prohibited Hanson's actions.**

4   The Court's next observes that the law on consent to removal was not clearly

5   established enough in 2018 to put the scope and intelligence of Reid's consent "beyond

6   debate." Reid principally cites three cases for the rule that consent must be "'unequivocal

7   and specific' and 'freely and intelligently given.'" Doc. 97 at 8 (citing *David*, 38 F.4th at

8   799; *Demaree*, 887 F.3d at 878; *U.S. v. Page*, 302 F.2d 81, 83–84 (9th Cir. 1962)). But

9   *David* and *Demaree* were not yet decided when Hanson picked up L.G. in March 2018.

10  *See Demaree v. Pederson*, 880 F.3d 1066 (Filed Jan. 23, 2018), *amended and superseded*

11  *on denial of rehearing en banc by Demaree v. Pedersen*, 887 F.3d 870 (Filed April 6,

12  2018). Even if they had been, *Demaree* was decided based on exigent circumstances, and

13  *David* was decided based on judicial deception and exigent circumstances. Consent was

14  not a contested issue in either case, so neither case could have put Hanson on notice that

15  Reid's consent was not secure. *Page* did involve consent, but under substantially different

16  circumstances suggesting coercion. Although these cases supply the *rule* that consent must

17  be "unequivocal and specific" and "freely and intelligently given," they do not help a

18  reasonable official in Hanson's circumstances understand how the rule applies. More

19  particularity is needed.

20  Reid's other authorities and the cases underlying them are similarly too general,

21  ambiguous, or too far removed to place the issue of Reid's consent beyond debate. Reid

22  cites the Arizona statute providing that consent is required absent a court order or exigent

23  circumstances. Doc. 97 at 8. But, again, the mere fact that consent was required does not

24  help a reasonable official understand whether it was secured. The plain language meaning

25  of "consent" is not enough. None of the cases Reid cites in her qualified immunity argument

26

27

28

have anything relevant to say about consent under the circumstances facing Hanson.[16] The cases the Court has identified are too factually dissimilar to remove the issue beyond debate. *See Jimeno*, 500 U.S. at 251 (consent to search for narcotics extended to a paper bag); *Lopez-Cruz*, 730 F.3d at 809 (consent to search phone did not extend to answering it); *Basher*, 629 F.3d at 1167 (consent to search a tent by nodding). Similarly, and finally, certain out-of-circuit decisions and underlying cases are not clearly applicable or controlling enough to put Hanson on notice that his actions were unlawful. *See Kovach v. United States*, 53 F.2d 639, 639 (6th Cir. 1931) (cited by *Page*, 302 F.2d at 83–84 (consent not intelligent when given by non-English speaking immigrant); *In re Tashia*, 909 N.Y.S.2d 345, 347–48 (Fam. Ct. 2010) (consent not intelligent when given by disabled teen incapable of understanding "the concept of foster care"). Though these cases could hypothetically establish a constitutional violation at the first step in the Court's qualified-immunity analysis, they cannot clear the second step because they require too much abstraction to place Hanson's conduct beyond debate.

### iv.  Reid's objections are unpersuasive.

Reid argues that (1) she consented only to Hanson picking L.G. up, not to DCS custody, (2) she had no idea she was giving up parental decision-making authority, (2) she consented to the services a dependency could provide, not realizing more was involved, and (3) Hanson told her that her employment would not be jeopardized by formal

---

[16] *See* Doc. 97 at 7–9 (citing *Tolan*, 572 U.S. at 656–57 (excessive force); *Pearson*, 555 U.S. at 232 (whether initial consent to informant entry was consent to subsequent police entry); *Harlow*, 457 at 818 (immunity for Presidential aides); *David*, 38 F.4th at 799 (exigent circumstances); *Demaree*, 887 F.3d at 878 (9th Cir. Apr. 6, 2018) (judicial deception and exigent circumstances); *Keates v. Koile*, 883 F.3d 1228, 1237–38 (9th Cir. Mar. 6, 2018) (judicial deception and exigent circumstances); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) (unconstitutional retaliation); *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1297 (9th Cir. 2007) (exigent circumstances); *Page*, 302 F.2d at 83–84 (coercion); *Singleton v. Kernan*, 851 Fed. App'x 737, 738 (9th Cir. Apr. 16, 2021) (unconstitutional retaliation); *Managed Protective Servs., Inc. v. City of Mesa*, 654 Fed. App'x 276, 277 (9th Cir. 2016) (excessive force); *Snider v. United States*, 468 F.3d 500, 508 n. 4 (8th Cir. 2006) (taxpayer information disclosure); *Fisher*, 234 F.3d at 317 (use of deadly force)).

accusations of abuse or neglect. *See, e.g.*, Doc. 98 at 9–10 ¶¶ 14, 15, 17 ¶ 29 (citing Doc. 98-2 at 34); Doc. 85-3 at 13–15; Doc. 97 at 4; *see also* Doc. 98-2 at 18–20, 42–43, 48–49. Reid further argues:

> Assuming the facts in [Reid]'s favor, Hanson knew that [Reid] was operating without the essential facts necessary for her to give meaningful consent to him taking her son. Indeed, [Reid] was operating under the assumption that whatever happened, there would be no allegations of neglect, because Hanson had "promised" her that. Plainly, consent was neither "unequivocal" nor "freely given" here, and Hanson knew it.

Doc. 97 at 9.

The Court disagrees with Reid's assessment. The Court appreciates that "the drawing of legitimate inferences from facts" is a jury function, *Liberty Lobby*, 477 U.S. at 255, but it nonetheless must determine whether any inference is "justifiable," *id.*, "rational[,] or reasonable." *T.W. Electrical Service v. Pacific Electrical Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). "Inferences from the nonmoving party's 'specific facts' as to other material facts … may be drawn only if they are reasonable in view of other undisputed background or contextual facts … [to] ensure[] that a 'genuine' issue of material fact exists for the factfinder to resolve at trial." *Id.* at 631–32. Here, the undisputed evidence does not permit the inference that Hanson recognized Reid's deficient understanding but proceeded with the removal anyway. Reid does not, for example, say she told Hanson she didn't understand the meaning of terms like "custody" or "dependency," or ever asked where L.G. was or when he would return home, or ever demonstrated her lack of understanding in some way or acted at all inconsistently with wanting L.G. removed. Quite the opposite—the undisputed evidence shows that Reid asked for L.G.'s removal and never protested any aspect of it despite many opportunities.

Furthermore, the qualified-immunity context requires an objective analysis. What Hanson knew or did not know is not the question. The question is what a reasonable official would know given Reid's version of the facts. Thus, even if an inference about Hanson's awareness were justifiable, it still would have no bearing on what a reasonable official would do under the circumstances. Limited to justifiable inferences from Reid's evidence—

- 38 -

including the nearly impossible challenge of monitoring L.G. 24/7 and the safety risk he presented to Reid's daughters—a jury could conclude at most that Hanson mistakenly believed Reid wanted L.G. removed, and that he could protect her from the risk of being accused of neglect. Qualified immunity exists precisely to avoid second-guessing this sort of mistake, made under urgent and difficult circumstances. Because a reasonable official could make the same mistake, there is no genuine issue for a jury to decide.

## III.   Order

For these reasons,

**IT IS ORDERED DENYING** Depke's and Fregoso's Motion for Summary Judgment (Doc. 89).

**IT IS FURTHER ORDERED GRANTING** Hanson's Motion for Summary Judgment (Doc. 83). The Clerk of the Court shall enter judgment for Hanson accordingly.

**IT IS FURTHER ORDERED SETTING** a trial-setting conference for **September 28, 2023**, at **11:30AM**, for half an hour. Before the Conference, the remaining parties shall meet and confer, and come prepared to discuss (1) whether a settlement conference is appropriate, (2) anticipated length of trial, and (3) a range of trial dates. The Conference will be in person and on the record, but the parties have leave to appear telephonically. If a party appears telephonically, contact chambers for call-in instructions at least 24 hours before the Conference.

Dated this 14th day of September, 2023.

John C. Hinderaker
United States District Judge