**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Justin Stein, et al., | No. CV-20-00102-TUC-JCH |
| Plaintiffs, | **ORDER** |
| v. | |
| Alyssa Depke, et al., | |
| Defendants. | |

In this case, as relevant to the remaining claims, Defendant DCS agents Depke and Fregoso removed Plaintiffs Justin and Jacqueline ("Jackie") Stein's son C.S. Defendants relied on the Steins' consent to removal, which the Steins alleged was never secured. The Steins charged Defendants with one count of unconstitutional removal and one count of judicial deception. The Court denied summary judgment for Defendants because:

> [u]nder the Steins' versions of the facts, which the Court must accept at this stage, [Defendants] violated clearly established law by failing to secure parental consent to removal. The Steins' evidence could convince a jury that [Defendants] did not explain basic aspects of removal and told the Steins "there is no turning back" when the Steins withdrew their consent. The Steins' evidence could also convince a jury that [Defendants] told the Juvenile Court the Steins did not want their son back shortly after the Steins said they did want him back.

Doc. 112 at 1.

Defendants moved for reconsideration on the unconstitutional removal claim, Doc. 119, and appealed. *See* Doc. 124. The Steins responded to the Motion for Reconsideration, Doc. 123, and this is the Court's resolution of the matter.

The Court will deny Defendants' Motion for Reconsideration except in a few minor ways. The bottom line here is that consent and coercion are mutually exclusive. Defendants moved for summary judgment based primarily on consent, and the Steins resisted summary judgment based primarily on coercion. Looking to the totality of the circumstances, and drawing all inferences for the Steins, the Court found that a jury could infer coercion such that any apparent consent was invalid under clearly established law. Defendants' Motion mostly fails to address this dynamic and is unpersuasive to the extent it does. The Ninth Circuit or a jury may decide differently, but that is not this Court's province.

**I.   Legal Standard**

Local Rule of Civil Procedure 7.2(g)(1) provides:

> The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence. Any such motion shall point out with specificity the matters that the movant believes were overlooked or misapprehended by the Court, any new matters being brought to the Court's attention for the first time and the reasons they were not presented earlier, and any specific modifications being sought in the Court's Order.

Manifest error is "error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record." *Estrada v. Bashas' Inc.*, No. CV-02-00591-PHX-RCB, 2014 WL 1319189, at *1 (D. Ariz. Apr. 1, 2014) (citing Black's Law Dictionary 622 (9th ed. 2009)).

Rule 59(e) of the Federal Rules of Civil Procedure also provides that a party may file a "motion to alter or amend a judgment" within "28 days after the entry of the judgment." A Rule 59(e) motion is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022) (citation and internal quotation marks omitted). District courts have "considerable discretion" in deciding Rule 59(e) motions and may grant them if "presented with newly discovered evidence, [the court] committed clear error, or if there is an intervening change in the controlling law." *Id.* (citations and internal quotation marks omitted).

Motions for reconsideration are not an opportunity for a party "to get a second bite at the apple," *Van Derheydt v. Cnty. of Placer*, 32 F. App'x 221, 223 (9th Cir. 2002), and should be granted only in rare circumstances. *Defenders of Wildlife v. Browner*, 909 F. Supp. 1342, 1351 (D. Ariz. 1995). They should not ask a court "to rethink what the court had already thought through – rightly or wrongly." *Defenders of Wildlife*, 909 F. Supp. at 1351 (citation omitted)). A motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). A motion for reconsideration also may not repeat any argument previously made in support of or in opposition to a motion. *Motorola, Inc. v. J.B. Rodgers Mech. Contractors, Inc.*, 215 F.R.D. 581, 586 (D. Ariz. 2003). Mere disagreement with a previous order is an insufficient basis for reconsideration. *See Leong v. Hilton Hotels Corp.*, 689 F. Supp. 1572, 1573 (D. Haw. 1988).

**II.   Analysis**

The Court denied summary judgment on the unconstitutional removal claim primarily because (1) consent is based on the totality of the circumstances, (2) the Court must draw all inferences for the nonmovant, and (3) considering those rules, the coercive aspects of the Steins' account rendered their consent involuntary under clearly established law. *See* Doc. 112 at 22–23, 28. Defendants challenge the Court's judgment as to (A) Fregoso, (B) Justin, (C) the timing of Jackie's statements, (D) whether Depke's beliefs were reasonable, and (E) whether the law was clearly established. The parties are familiar with the facts, so the Court does not repeat them except as necessary.

**A. The Court will deny the motion for reconsideration as to Fregoso because Defendants identify only a superficial mistake in the Court's reasoning.**

The Court denied summary judgment for Fregoso because (1) Defendants "did not assert [Fregoso's absence from the Steins' home] as a basis for their motion for summary judgment" and (2) even if they had, "Fregoso's physical absence … is not dispositive." Doc. 112 at 21–22. Defendants' challenges to the first basis for the Court's Order are unpersuasive because the Court correctly held them to their obligations at summary

- 3 -

1 judgment. Defendants' challenge to the second basis for the Court's Order identifies a superficial mistake but does not change the result.

Challenging the first basis for the Court's Order, Defendants argue that "[i]n a § 1983 claim, plaintiffs must present evidence in their Opposition showing … that *each* Defendant was an 'integral participant.'" Doc. 119 at 3 (citing *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004); *Monteilh v. Cnty. Of Los Angeles*, 820 F. Supp. 2d 1081, 1090 (C.D. Cal. 2011)) (emphasis in original). Defendants argue that "both Depke and Fregoso moved for summary judgment [based on the Steins' consent]" and so the summary-judgment burden shifted to the Steins to "demonstrate that Depke and Fregoso were each an integral participant in the allegedly unconstitutional actions." Doc. 119 at 3.

Defendants are mistaken. Simply moving for summary judgment is not sufficient to carry the movant's initial burden of production. The movant must present the *basis* for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also* LRCiv. 7.2(b). Defendants did not present Fregoso's absence from the Stein's house as a basis for summary judgment. *See generally* Doc. 89. In fact, Defendants specifically asserted that the Steins signed a Temporary Custody Notice ("TCN") "in the presence of Depke and Fregoso." Doc. 89 at 9. Under those circumstances, the Steins were not obligated to produce any evidence establishing Fregoso's presence in their house. *Cf. Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). Defendants' cases do not hold to the contrary. *See Boyd*, 374 F.3d at 780 (no discussion of burden shifting at summary judgment); *Monteilh*, 820 F. Supp. 2d at 1089–90 (same).

Seeking a different way to avoid the first basis for the Court's Order as to Fregoso, Defendants urge the Court to "invoke Rule 56(f) rather than commit manifest injustice by summarily denying a Reply argument." Doc. 119 at 4–5. Rule 56(f) of the Federal Rules of Civil Procedure provides:

> After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

As Defendants identify, "'manifest injustice'" occurs when a court order "(1) causes 'clear and certain prejudice to the moving party' and (2) 'is fundamentally unfair in light of governing law.'" Doc. 119 at 4 (citing *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018). But refusing to credit an argument raised for the first time in a reply is not fundamentally unfair. *Cf. Leidos*, 881 F.3d at 217 ("[M]anifest injustice 'does not exist where … a party could have easily avoided the outcome, …. [but rather where a decision] would 'upset settled expectations[.]'"). As just discussed, the moving party has an initial burden to present the basis for its summary judgment motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also* LRCiv. 7.2(b). Having failed to carry that burden with respect to Fregoso's presence in the Steins' house, the Steins were not obligated to produce any evidence supporting their allegations. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). Enforcing Defendants' obligation is therefore a correct application of governing law, not a manifestly unjust disregard of it. And even if the Court reopened the issue and acted under Rule 56(f), the Court would still ultimately deny summary judgment for Fregoso again for the reasons stated as a second basis for the Court's ruling.

Defendants next challenge the Court's second basis for ruling: that Fregoso's absence from the Steins' home was not dispositive. Defendants assert the Court manifestly erred by relying on a previous order and the Court's own speculation. Doc. 119 at 2–3. In its summary judgment Order, the Court wrote:

> The Court previously found that the Steins stated a claim for unconstitutional removal against both Depke and Fregoso. Doc. 34 at 12–14. Both Depke and Fregoso were implicated by, for example, allegations that Depke and Fregoso were together during the events that called parental consent into question. See *id.* at 13 (citing Doc. 25 at 16 ¶ 44) (Depke "later returned with DCS Supervisor Fregoso to initiate removal proceedings").

Doc. 112 at 21. Defendants argue that the Court's reasoning was erroneous because "the Steins never made those allegations in the Complaint and never produced evidence that [Defendants] were together during the removal." Doc. 119 at 2 (citing Doc. 25 ¶¶ 44–45). Defendants further argue the Court improperly speculated about Fregoso's involvement.

*Id.* at 3.

Defendants are partly correct about the Court's characterization of the Complaint, but Defendants were not prejudiced. The Complaint did not allege that Depke and Fregoso were together "during the events that called parental consent into question." Instead, the events that called parental consent into question, alleged in Doc. 25 ¶ 44, happened before "Depke then left the house, and returned with … Fregoso." Doc. 25 ¶ 45. The Court's characterization was mistaken to the extent it suggested the Complaint alleged Fregoso was inside the Steins' house. But Defendants go too far by claiming the Complaint did not allege Depke and Fregoso were together "during the removal." The Complaint alleges "Depke … left … and returned with … Fregoso" before C.S. "was … removed by both Defendants." Doc. 25 at ¶ 45. That means Depke and Fregoso were allegedly together during the removal if not the events surrounding parental consent.

Defendants thus identify a superficial mistake, not manifest error. The Court was considering whether a jury could infer Fregoso's liability even if she was not inside the Steins' house during the removal—not merely if Fregoso was not inside "during the events that called parental consent into question." The Court listed several inferences a jury could draw from the Steins' evidence, concluding:

> The fact that Fregoso was never inside the Stein's home does not mean that Fregoso did not (1) direct Depke to act as she did, (2) set in motion a series of events that would cause Depke to act as she did, or (3) know what Depke was about to do or had done and failed to stop or correct her.

*Id.* Each of those inferences applies whether Fregoso was present "during the events that called parental consent into question" or "during the removal." The Court's "speculation," Doc. 119 at 3, was its effort to articulate inferences a jury could draw for the nonmovant. Defendants cite no law prohibiting the Court from doing that and identify no substantive error in the inferences the Court considered. *Cf. Boyd*, 374 F.3d at 780 (officers who stood outside during a search, and an officer who stood back during use of a flash-bang, were integral participants); *Monteilh*, 820 F. Supp. 2d at 1089–90 (officers who had no reason to know a child was being removed without a court order were not integral participants).

For those reasons, the Court will deny the motion for reconsideration as to Fregoso.

**B. The Court will deny the motion for reconsideration as to Justin except to the extent the Court reasoned that Jackie could withhold Justin's consent for him.**

The Court denied summary judgment as to Justin because (1) "a jury could infer that Jackie was speaking for both Steins throughout her encounter with Depke, such that Justin's consent was withheld to the same extent as Jackie's, and never secured for the same reasons as Jackie's," and (2) "Justin's consent was never secured in any event because it was not voluntarily or intelligently given, or at least its scope was exceeded." Doc. 112 at 20. Defendants challenge the first reason and part of the second. *See* Doc. 119 at 5–9. The Court agrees it was a mistake to suggest Jackie could withhold Justin's consent for him but disagrees with Defendants in all other respects.

**(1) Whether Jackie could withhold Justin's consent by speaking for him**

Defendants first challenge the inference that Jackie spoke for Justin. Doc. 119 at 5–6. As above, Defendants cite no law prohibiting the Court from considering inferences in the nonmovants favor. Ample precedent requires the Court to do so. But Defendants persuasively argue that even if the inference were warranted, it could not support the conclusion that Jackie withdrew Justin's consent for him. The Court itself noted that "federal law only creates a cause of action for that occupant whose consent is withheld." Doc. 112 at 20 (citing *Smith v. City of Santa Clara*, 876 F.3d 987, 990 (9th Cir. 2017)). Upon reconsideration, and without endorsing Defendant's arguments entirely, the Court agrees that Jackie could not withhold Justin's consent for him. To the extent the Court's Order reasoned otherwise, it was manifest error.

**(2) Whether the scope of Justin's consent was exceeded**

Defendants next challenge part of the Court's second reason for denying summary judgment as to Justin: that the scope of the Steins' consent was exceeded. *See* Doc. 119 at 7–8. Defendants first assert the Steins never argued that C.S.'s removal exceeded the scope of their consent. *Id.* at 7. The Court disagrees. The Steins argued in the alternative that they wanted C.S. removed only to receive services, that consent must be "specific," and that consent depends on the totality of the circumstances. Doc. 95 at 3, 5. Those arguments put

- 7 -

Defendants on fair notice that the scope of the Steins' consent was at issue.

Defendants also assert that "no reasonable jury could believe that the Steins intended to consent to removal of [C.S.] only for the purposes of securing services." Doc. 119 at 7. Defendants essentially seek to relitigate something the Court has already considered and decided. *See, e.g.*, Doc. 112 at 12 (crediting the Steins' "straightforward and consistent" story that they sought services for C.S. and asked for him back when they learned he had received those services); *id.* at 16 ("Seen in context, the Steins' consent was specific to the services they believed DCS was offering through temporary removal.").

Even if Defendants' arguments were a proper basis for reconsideration, they are unpersuasive. Defendants argue that "Depke explicitly and repeatedly told [the Steins] that [DCS] could not provide [the] services [the Steins were requesting]." Doc. 119 at 7 (citing Doc. 96 at 10–11 ¶ 13). Defendants also argue that "the Steins made judicial admissions to that effect." *Id.* at 7–8 (citing Doc. 25 ¶ 44 and numerous judicial admission cases). But a jury could believe from the Steins' evidence that Depke said DCS could not provide the services the Steins were requesting *unless they consented to removal*. Doc. 96 at 17 ¶ 12–14. A jury could also infer that Depke knew from her conversation with Jablonsky that Jablonsky had "led [the Steins] to believe that having Depke take their son was the only way for him to receive the help he needed." Doc. 96 at 17 ¶ 14; Doc. 112 at 16 (making a substantially similar point about drawing inferences based on Depke's conversation with Jablonsky). And even if allegations in a complaint were binding judicial admissions, *see infra* § II.B.(3) (disagreeing on that point), consenting to removal only to the extent it could provide C.S. with services is not inconsistent with the Complaint's allegations that "the only way [Depke] would take [C.S.] was if the parents admitted they were neglecting [C.S.] and [DCS would take custody of him]." Doc. 25 ¶ 44.

**(3) Whether Justin's consent was "intelligent"**

Defendants next challenge a different part of the Court's second reason for denying summary judgment as to Justin: that the Steins' consent was not "intelligent." *See* Doc. 119 at 8–9. Defendants assert that the Court improperly held Defendants to a 6th Amendment

1  "intelligent" standard despite the 4th Amendment context of this case. Doc. 119 at 8 (citing
2  *Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973)). Defendants made this argument
3  already. Doc. 106 at 7–8; Hr'g Tr. at 26:10–14. Even if it were a proper basis for
4  reconsideration, the Court acknowledged the very difference Defendants urge. Doc. 112
5  at 15 (citing *Bustamonte*). But as the Court pointed out, "Fourth Amendment 'specific' and
6  'intelligent' consent requires more than a signature. The totality of the circumstances
7  surrounding that signature matter." *Id.* Defendants object to some of the Court's examples
8  of basic information the Steins lacked. *See* Doc. 119 at 9. Even if Defendants were correct,
9  their argument misses the point. Looking at the totality of the circumstances, and *drawing*
10 *all inferences for the nonmovant*, a jury could conclude that the Steins did not have enough
11 information to consent specifically and intelligently under a 4th Amendment standard. By
12 focusing narrowly, Defendants fail to grapple with the larger issue and the Court's
13 obligations at summary judgment.

14       Finally, Defendants unpersuasively argue that "the undisputed facts show that
15 Depke did inform the Steins of many of the consequences of consenting to removal." Doc.
16 119 at 9. First, the Court declines Defendants' invitation to revisit the totality of the
17 circumstances. Second, Defendants' individual points are unpersuasive. Defendants'
18 "judicial admissions" argument is flawed because the authorities they cite do not say that
19 an allegation in a complaint is a judicial admission. *See Am. Title Ins. Co. v. Lacelaw Corp.*,
20 861 F.2d 224, 226 (9th Cir. 1988) ("judicial admissions … dispens[e] wholly with the need
21 for proof of the fact [admitted]"); *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008)
22 ("Hakopian's *subsequent responsive admission* of the government's allegation constituted
23 a judicial admission") (emphasis added); *Christian Legal Soc. Chapter of the Univ. of Cal.*
24 *Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 675 (2010) (stipulations are judicial
25 admissions); *Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1033 n. 1 (9th Cir.
26 2020) ("Catalina admitted *in its answer* that it was a place of public accommodation, and
27 this admission is binding.") (emphasis added); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
28 568 U.S. 455, 470 n.6 (2013) ("Amgen conceded *in its answer* that the market for its

securities is 'efficient' …. [and] remains bound by that concession.") (emphasis added). Defendants' argument that Jackie knew "temporary DCS custody might become permanent" ignores the Court's obligation to draw all inferences for the nonmovant. And Defendants' argument that they are not liable for the TCN's shortcomings ignores that consent is based on the totality of the circumstances.

For those reasons, the Court will grant the motion for reconsideration as to Justin to the extent the Court's Order reasoned that Jackie could withhold Justin's consent for him. The Court will deny the motion as to Justin in all other respects. A trial is still needed to determine whether Justin's consent was valid.

### C. The Court will deny the motion for reconsideration as to the timing of Jackie's statements because it already found the timing was immaterial.

The Court reasoned that the timing of Jackie's statement was disputed because (1) Defendants' arguments to the contrary were unpersuasive, (2) the Court must draw all inferences for the nonmovant, and (3) the timing "is ultimately immaterial to the Court's disposition[.]" Doc. 112 at 9 n.4. Defendants assert the Court should have examined whether it was substantially justified or harmless to consider "Jackie Stein's late-breaking story that she told Depke that she 'didn't want to do this anymore' and 'get out of her house' *after* signing the consent form contrary to her interrogatory responses and the Complaint[.]" Doc. 119 at 9–11. The Court disagrees.

Defendants could have raised these arguments previously and did in fact raise similar arguments. *See* Doc. 106 at 3. They are not a proper basis for reconsideration. Defendants also conspicuously ignore the Court's reasoning that the timing of Jackie's statement was immaterial because Depke said "there [is] no turning back" after Jackie withdrew her consent either way. *See* Doc. 112 at 1 (explaining the significance of Depke's statement without reference to the timing), 15 (same), 16 (same), 25 (same), 26 (same), 27 (same), 28 (same). As the Court observed,

> Whether Depke's remark came before or after Jackie signed the TCN is immaterial. Jackie was free to withdraw consent before signing or after. Depke was mistaken to tell Jackie she could not.

- 10 -

*Id.* at 26.

For those reasons, the Court will deny the motion for reconsideration as to the timing of Jackie's statements.

**D. The Court will deny the motion for reconsideration as to Depke's beliefs regarding probable cause and consent but will also clarify its Order slightly.**

The Court reasoned that Depke's belief she had probable cause was unreasonable in part because (1) implying an argument in a motion for summary judgment "is not sufficient to carry the initial burden," (2) Depke's statements were "ominously vague and not clearly an explanation she would seek a court-authorized removal," and (3) the information Depke gathered was disputed and susceptible to competing interpretations. Doc. 112 at 17–19. The Court reasoned that Depke's belief she had consent was unreasonable "at least from the time Depke said 'there [is] no turning back.'" *Id.* at 25. Defendants first assert the Court erroneously relied on an absence of exigent circumstances to find Depke did not have probable cause to remove C.S. *Id.* at 11–13. Defendants next assert the Court disregarded or misinterpreted law that gave Depke reason to believe she had valid consent. *Id.* at 13–14. The Court is not persuaded but takes the opportunity to clarify some of its reasoning.

As to probable cause, Defendants could have raised these arguments previously and did in fact raise similar arguments. *See* Doc. 89 at 12–13 (implying the Steins' consented to avoid being in "a worse pickle"); Doc. 106 at 6–7 (explicitly arguing Depke could "easily have … ask[ed] a court to find probable cause"). As above, the Court is well within its discretion to deny an argument raised for the first time in a reply. The Court also considered the merits in the alternative. Defendants address only some of the Court's examples of competing evidence and inferences, not its observation that Depke's statements were ominously vague. However, the Court will take the opportunity to clarify part of its Order. The Court appreciated the distinction between probable cause and exigent circumstances, *see, e.g.*, Doc. 112 at 4 n.1, but could have made its reasoning more apparent. The Court clarifies as follows:

DCS removed C.S. on October 9, 2019. Doc. 96 at 19 ¶ 27. At the time, the relevant Arizona statute provided:

> A. A child shall be taken into temporary custody only pursuant to one of the following:
> 1. An order of the superior court.
> 2. Subsection D of this section ["exigent circumstances"].
> 3. The consent of the child's parent or guardian.
>
> ….
>
> D. A child may be taken into temporary custody without a court order by a peace officer, a child welfare investigator or a child safety worker if temporary custody is clearly necessary to protect the child because exigent circumstances exist.
>
> ….
>
> K. For the purposes of this section, "exigent circumstances" means there is probable cause to believe that the child is likely to suffer serious harm in the time it would take to obtain a court order for removal and either of the following is true:
> 1. There is no less intrusive alternative to taking temporary custody of the child that would reasonably and sufficiently protect the child's health or safety.
> 2. Probable cause exists to believe that the child is a victim of sexual abuse or abuse involving serious physical injury that can be diagnosed only by a physician who is licensed pursuant to title 32, chapter 13 or 17 or a health care provider who is licensed pursuant to title 32 and who has specific training in evaluations of child abuse.

Ariz. Rev. Stat. Ann. § 8-821. To summarize: "exigent circumstances means" (1) "probable cause to believe the child is likely to suffer serious harm in the time it would take to obtain a court order" plus (2) "no less intrusive alternative to taking temporary custody." Given that statutory context, the Court understood Defendants' concession that there were no exigent circumstances, Hr'g Tr. at 3:18–19, and Depke's statement that there were "no apparent exigent circumstances," Doc. 91-1 at 246–47, as conceding that DCS did not have probable cause. Defendants challenge that understanding. They say they were conceding exigent circumstances under A.R.S. § 8-821(A)(2), not probable cause to get a court order under A.R.S. § 8-821(A)(1). *See* Doc. 119 at 11–14.

Defendants' arguments are unpersuasive. Defendants first argue that probable cause "is not a high bar," Doc. 119 at 12 (citing *Kaley v. United States*, 571 U.S. 320, 338 (2014)), and requires only "'some credible evidence.'" *Id.* (citing *Joseph V. v. McKay*, No. 1 CA-CV 17-0052, 2018 WL 4208988, at *3 (Ariz. Ct. App. Sept. 4, 2018)). But drawing all

- 12 -

inferences for the Steins, Depke did not have credible evidence that C.S. was at risk of neglect. All she had was evidence showing "the Steins were exhausted and expressing themselves dramatically to convey the urgency of their need, not that they intended to abandon C.S." Doc. 112 at 18. Defendants do not explain, for example, how the Court could find the Steins were keeping C.S. unattended in his room while still drawing all inferences for the nonmovant. Depke's investigation did include reviewing an email that expressed concerns that "[C.S.] was placed in a room upstairs and the door was shut with no supervision." Doc. 90 ¶ 12 (citing Doc. 91-1 at 243). But that same email also acknowledged that "my supervisor … said there was nothing I could prove to elevate this to DCS …. [and the whole team] stated maybe next time I could ask to see if [C.S.] had the ability to let himself out[.]" Doc. 91-1 at 243. Drawing all inferences for the Steins, not Depke, a reasonable official would not believe that the email was credible evidence of a risk of neglect. That is just one example of what the Court meant when it said that Depke's investigation is subject to "competing interpretations." Doc. 112 at 18. Defendants are correct Depke could not account for evidence of which she was unaware. Doc. 119 at 13. The Court was mistaken to consider any sources to the extent they were beyond the reach of drawing inferences for the nonmovant. *See* Doc. 112 at 19:2–6. But the evidence of which Depke *was* aware, drawing all inferences for the Steins, did not amount to probable cause. Even if it had, the Court repeats that Depke's statements were "ominously vague, not clearly an explanation that Depke would seek a court authorized removal if consent was [withheld]." Doc. 112 at 18 (cleaned up) (citation omitted).

As to Jackie's consent, Defendants argue that they "reminded this Court of controlling Ninth Circuit law, cited in their Reply, that …. the Court … appears to have overlooked[.]" Doc. 119 at 13 (citing *Loudermilk v. Danner*, 449 F. App'x 693, 695 (9th Cir. 2011)). Defendants made this argument already, Doc. 106 at 3, Doc. 111 at 4–5, and the Court did not overlook it. It cannot form the basis for reconsideration. Even if it could, *Loudermilk* is not precedential, *see* 449 F. App'x at 693 (citing Ninth Circuit Rule 36-3), and easily distinguished. In *Loudermilk*, officials with evidence of exposed wiring in an

unfinished house explained to parents that the officials had probable cause for a court order and would seek a court order unless the parents consented to removal. 449 F. App'x at 695. Here, by contrast,

> Depke told Jackie not signing "would look bad," and "there was no turning back and [the Steins] might not get [C.S.] back." Doc. 96 at 18 ¶¶ 24, 26. That is hardly the same as offering parents suspected of abuse or neglect an option short of removal. Depke's statements were ominously vague, not clearly an "expla[nation] that [Depke would] seek a court authorized removal if consent [was] denied."

Doc. 112 at 18. In *Loudermilk*, the court reasoned that "a reasonable police officer would not have known that consent was involuntary when the police officers withdrew their initial threat to enter the Loudermilk's home without a warrant." 449 F. App'x at 695 (citing *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (an unabated threat renders consent involuntary)). Here,

> The Steins were in a vulnerable subjective state—"desperate" and "tearful[]"—following C.S.'s attack on Justin. Depke told Jackie she could not write in "signing under duress," and that it would "look bad" for the Steins if Jackie refused to sign. After Jackie said she "didn't want to do this anymore" and asked Depke to leave, Depke refused and said "she was taking [C.S.] no matter what, [a]nd there was no turning back." These facts fit within three of the five [Ninth Circuit] factors: (1) they are evidence of coercive tactics, (2) they are evidence that at least Jackie did not know she could refuse to consent, and (3) they are evidence of Depke telling the Steins that withholding consent was futile in a threatening manner. These facts are also evidence of an unabated threat.

Doc. 112 at 15 (applying, among others, *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004)). Thus, and as with probable cause, even if Depke had not just made vague threats and had "explain[ed] that taking temporary custody of [C.S.] under Arizona law was a 'viable option,'" *Loudermilk*, 449 F. App'x at 695, that explanation would be "baseless" under a summary judgment standard for drawing inferences. *Cf. id.*

Defendants next argue that the Court misapprehended two other cases they cited. Doc. 119 at 14 (citing *Smith v. Williams-Ash*, 520 F.3d 596, 598 (6th Cir. 2008); *Dupuy v. Samuels*, 465 F.3d 757, 761 (7th Cir. 2006)). Both involved "safety plans," which are:

> restrictions short of removal … imposed pending completion of the state's

> investigation into abuse or neglect. [They] might require that one of the parents leave the house where the child is living, or that he keep out of the child's presence unless a designated family member is present as well, or that the child be sent to live with other family members.

*Dupuy v. Samuels*, 465 F.3d 757, 760 (7th Cir. 2006); *accord Smith*, 520 F.3d at 598 (adopting *Dupuy*'s reasoning). In *Smith*,

> The safety plan informed the Smiths, "[Y]our decision to sign this safety plan is voluntary," and read:
>   1. This safety plan is a specific agreement to help ensure your child(ren)'s safety.
>   2. The custody of your child(ren) does not change under this safety plan.
>   3. Children's Services is here to help you protect your child(ren) when you may not be able to do it on your own.
>   4. If you cannot or will not be able to continue following the plan, Children's Services may have to take other action(s) to keep your child(ren) safe.
>   5. The safety plan will end when you are able to protect your child(ren) without help from Children's Services.
>   6. This safety plan may be changed if new or different services are necessary.
>   7. You must contact your caseworker immediately if you decide that you cannot or will not be able to continue following the plan.

520 F.3d at 598. Similarly, under Arizona law:

> [DCS] may accept a voluntary placement agreement [("VPA")] only if the department can provide necessary services that are likely to remedy the circumstances that bring the child into care within the ninety day period and one of the following applies:
>   1. The department plans to return the child to the parent, guardian or custodian who signed the child into voluntary placement.
>   2. While the child is in voluntary placement, the parent, guardian or custodian arranges a safe alternative placement for the child after the voluntary placement.

A.R.S. § 8-806(D). VPAs require written informed consent and are terminable "on receipt of written revocation of consent by the parent, guardian or custodian." A.R.S. § 8-806(E). Further, a VPA may not result in criminal culpability to the parent:

> The fact of voluntary placement does not constitute abandonment, abuse or dependency as defined in this article and may not be used in a judicial proceeding as an admission of criminal wrongdoing by that parent, guardian

or custodian.

A.R.S. § 8-806(G). In its Order, the Court explained that it used the term "VPA" "because it is standard in Arizona, *see* A.R.S. § 8-806(D)," even though "other jurisdictions use 'Voluntary Safety Plan' or 'Voluntary Separation Agreement.'" Doc. 112 at 8 n.3. When discussing *Dupuy*, the Court first referred to it as involving "safety plans," Doc. 112 at 17, then later as involving a "VPA." Doc. 112 at 19, 28 (together with *Smith*). Defendants object to the latter characterization, arguing:

> *Smith* and *Dupuy* discuss safety plans – which are not VPAs. A VPA is a statutory construction that allows the state, under limited circumstances, to take legal custody of a non-neglected, non-abused child so that it can receive services. *Smith* and *Dupuy* did not deal with VPAs. They discussed "safety plans," in which the parents consented to the state taking legal custody of the children as an alternative to Court-ordered removal. …. That is exactly what happened here.

Doc. 119 at 14.

Defendants are correct that *Smith* and *Dupuy* do not involve VPAs, but their argument again misses the forest for the trees. The Court's reasoning applies whether the Steins' options included a "safety plan" or a "VPA." The two are similar. VPAs may involve state custody, Doc. 119 at 14:6, but safety plans to do not. *See Dupuy*, 465 F.3d at 760 (safety plans involve "curtailments of parental rights … less extreme than removing the child from parental custody altogether"); *Smith*, 520 F.3d at 598 ("[T]he custody of your child(ren) does not change under this safety plan."). Modified with Defendants' distinction, the Court's reasoning applies without much difference:

> [T]he facts surrounding at least Jackie's consent and motivation are substantially disputed. For example, the parties do not agree whether their discussion of a family member taking C.S. for a few days, Doc. 96 at 16 ¶ 10, was a discussion of a [safety plan] like the one in *Dupuy*. Doc. 106 at 6 (citing Doc. 90 ¶ 14 (no mention of [safety plan]s); see also Doc. 96 at 17 ¶ 11 ("Depke never informed the Steins that DCS would have to take temporary custody of their son if the Steins were unable to make other arrangements"); Doc. 96-7 ¶ 5 ("Depke never brought up the option of a Voluntary Placement Agreement with us.").

Doc. 112 at 19. Similarly,

> [Defendants'] cases are not binding on this Court and are not helpful to them in any event. …. [I]n *Smith* and *Dupuy*, the parents chose a [safety plan] to avoid removal. Doc. 89 at 14 (citing *Smith*, 520 F.3d at 600; *Dupuy*, 465 F.3d at 761). That is different from this case, where the Steins would have "immediately" accepted a VPA and did not understand what removal meant.

Doc. 112 at 28. Given that the Steins would have "immediately" accepted a VPA, and even if a "safety plan" is less restrictive than a VPA because it does not involve state custody, the Steins are also entitled to the inference that they would have "immediately" accepted a less restrictive "safety plan" but were not told about them. Given the robust disclosure apparently involved, *see Smith*, 520 F.3d at 598, the Court finds it hard to believe that Depke meant to inform the Steins of safety plans—any more than VPAs—merely by asking whether C.S. could stay with a family member. A jury may feel differently and side with Depke, but that is not for the Court to decide at summary judgment.

For those reasons, the Court will deny the motion for reconsideration as to whether Depke could reasonably believe she had probable cause or had secured Jackie's consent.

**E. The Court will deny the motion for reconsideration as to qualified immunity because it already thought through the issue and remains unpersuaded.**

The Court denied qualified immunity based on the "coercive aspects of the Steins' account." Doc. 112 at 22. Defendants assert the Court manifestly erred because no cases decided under similar circumstances notified Defendants that their conduct was unconstitutional. *See* Doc. 119 at 14–15. First, Defendants argue they could not have known removal based on a single parent's consent was insufficient, citing a district court order issued after oral argument on the motion for summary judgment. *Id.* at 15–16 (citing *MacDonald v. Or. Health & Sci. Univ.*, 2023 WL 5529959 (D. Or., Aug. 28, 2023). Second, Defendants disagree with the Court's analysis of two cases. *Id.* at 16–18 (citing *LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986), and *United States v. Shaibu*, 920 F.2d 1423 (9th Cir. 1990)).

Defendants could have raised these arguments previously and did in fact raise similar arguments. *See* Doc. 89 at 15 (arguing a reasonable official would not have known that consent was ineffective under Arizona law); Doc. 106 at 8 (distinguishing *LaDuke* and

*Shaibu*). The district court order Defendants cite is not a "change in controlling law," and the Court finds it unpersuasive in any event. *Cf. MacDonald*, 2023 WL 5529959 at *9–10 (declining to apply cases asserting rights and facts different from First Amendment law applied to "a hospital enforcing a state-wide vaccine mandate in the face of a global pandemic"). Here, by contrast, the Court applied Fourth Amendment law governing warrantless searches and seizures to a warrantless seizure.

Defendants argue (again) that the Steins' Fourth Amendment cases are too different to notify Defendants that their actions were unlawful. *See* Doc. 119 at 14–18. But the admonition they emphasize—that the Court may not define a right too generally—does not help them here. The question was whether clearly established law puts the issue beyond debate. The law clearly illustrates that consent cannot be coerced. The law also illustrates clearly enough what "consent" and "coercion" mean. Looking to those cases the Steins' provided, Defendants could have appreciated that the circumstances they faced were coercive. True, they "had no guns and no flashing lights." Doc. 119 at 17. But a few common-sense observations could have clued them in. For example,

> DCS … [is] commonly—and in this case specifically, *see* Doc. 91-1 at 33—associated with taking children away from their parents[,] [Doc. 112 at 26], [and t]he Steins were in a vulnerable subjective state—"desperate" and "tearful[]"—following C.S.'s attack on Justin. Depke told Jackie she could not write in "signing under duress," and that it would "look bad" for the Steins if Jackie refused to sign. After Jackie said she "didn't want to do this anymore" and asked Depke to leave, Depke refused and said "she was taking [C.S.] no matter what, [a]nd there was no turning back."

Doc. 112 at 15. Similarly, "a reasonable DCS official would have no confidence that one parent's consent was a sufficiently good reason to remove a child when the other parent stood there saying 'I don't want to do this anymore' and 'get out of my house.'" Doc. 112 at 27. The fact that Arizona law *might* permit consent with one parent does not matter. First, the Arizona law says only that consent of "*the* child's parent or guardian" is required for temporary custody by consent. A.R.S. § 8-821 (emphasis added). The use of the definite article could mean that consent is required from anyone who is "the" parent, whether one or two. Defendants cited no cases to the contrary. The statute could also mean "the child's

- 18 -

parent" as opposed to "the child's parents." Defendants cited no authority for that proposition, either. In any event, the plain language is ambiguous. Defendant's previous point that requiring consent from both parents would not be "sensible," Doc. 89 at 12 n. 4, is also unpersuasive. That approach seems more sensible than permitting removal from one parent with consent from the other, especially when both are present. Second, and finally, Defendants are expected to appreciate that federal law governs constitutional rights. They are also expected to appreciate that removing children implicates constitutional rights. So ambiguous state law could not and cannot help them.

For those reasons, the Court will deny the motion for reconsideration as to qualified immunity.

### III. Order

Accordingly,

**IT IS ORDERED GRANTING IN PART** Defendants' Motion (Doc. 119) to the extent the Court previously reasoned that Jackie could withhold Justin's consent for him.

**IT IS FURTHER ORDERED DENYING IN PART** Defendant's Motion (Doc. 119) in all other respects.

**IT IS FURTHER ORDERED AFFIRMING** trial, which is scheduled to begin on April 22, 2024.

Dated this 1st day of November, 2023.

_____
John C. Hinderaker
United States District Judge