Michael Garth Moore (023742)
6336 N. Oracle Rd. Suite 326 #119
Tucson, Arizona 85704
Tel: 520-318-0075
mike@mgmoorelaw.com

Larry J. Wulkan (021404)
Jennifer L. Allen (027941)
**ZWILLINGER WULKAN PLC**
2020 N. Central Ave. Suite 675
Phoenix, Arizona 85004
Tel: 602-962-0089
larry.wulkan@zwfirm.com
jennifer.allen@zwfirm.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| Justin Stein, et al., | Case No.: 4:20-cv-00102-JCH |
|---|---|
| Plaintiffs, | **PLAINTIFFS' FIRST MOTION FOR ATTORNEYS' FEES AND EXPENSES** |
| v. | |
| Alyssa Depke, et al., | |
| Defendants. | |

Plaintiffs request $736,756.00 in attorneys' fees for merits work on this case through June 28, 2024, plus $21,813.00 for fees incurred preparing this motion, and $15,564.85 in expenses.

**STATEMENT OF PROCEEDINGS**

This civil rights action arose from, among other things, Defendants' judicial deception, which caused the Juvenile Division of the Superior Court of Pima County to enter its October 14, 2019 Temporary Orders and Findings, awarding DCS physical and legal custody of C.S. After those orders were entered, Plaintiffs did not have full custody of their son until the dependency action was terminated on January 31, 2020.

This action was vigorously defended. Defendants filed a motion to dismiss (Doc. 26), which Plaintiffs defeated. *See* Doc. 34. Defendants' counsel deposed every witness,

who testified in the case who was not employed by the State of Arizona. Defendants filed a motion for summary judgment (Doc. 89), which Plaintiffs defeated. *See* Doc. 112. Defendants appealed the denial of their motion for summary judgment to the Ninth Circuit Court of Appeals. *See* Doc. 121. So as to "avoid the lengthy delay that an interlocutory appeal" would cause, Plaintiffs voluntarily dismissed, with prejudice, the only count of the complaint that was subject to pre-trial appellate review. Doc. 135 at 2:11-12. Even though Defendants directly benefited, and suffered no prejudice, from that dismissal, they still opposed it, unnecessarily expanding this litigation. *See* Doc. 132.

After a two-week jury trial, the jury returned a unanimous verdict, finding that Defendant Fregoso violated each of the Plaintiffs' "federal civil rights by committing Judicial Deception." *See* Doc. 244. The jury awarded: Jacqueline Stein $184,800 in compensatory damages and $33,333 in punitive damages; Justin Stein $312,000 in compensatory damages and $33,333 in punitive damages; and C.S. $604,500 in compensatory damages and $33,334 in punitive damages. *Id*.

Plaintiffs now seek their first award of fees. They anticipate filing successive fee petitions after (1) all post-trial motions are resolved, (2) briefing on fees is completed, and (3) any appeal.

**I.  AS THE PREVAILING PARTY, PLAINTIFFS ARE ELIGIBLE FOR ATTORNEYS' FEES IN THE DISTRICT COURT.**

Under 42 U.S.C. § 1988(b), the Court should grant reasonable attorneys' fees to a prevailing plaintiff, whose fee award is presumptively reasonable under the lodestar method—"the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "The established standard when determining a reasonable hourly rate is the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2018) (citing *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984)). The "district court should consider:

experience, reputation, and ability of the attorney; the outcome of the results of the proceedings; the customary fees; and the novelty or the difficulty of the question presented." *Hiken v. Dep't of Def.*, 836 F.3d 1037, 1044 (9th Cir. 2016) (quoting *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1211 (9th Cir. 1986)). "In general, affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." *Id.* (cleaned up).

As the Supreme Court has emphasized: "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," which encompasses "all hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435. The relevant inquiry is whether "the time could reasonably have been billed to a private client." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (citing *Hensley*, 461 U.S. at 424). "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno*, 534 F.3d at 1112. "If opposing counsel cannot come up with specific reasons for reducing the fee request that the district court finds persuasive, it should normally grant the award in full, or with no more than a haircut." *Id.* at 1116.

II. **PLAINTIFFS ARE ENTITLED TO THE FEES THEY SEEK.**

   A. **The 2024 hourly rates of Plaintiffs' attorneys are reasonable in light of their skill, experience, and reputation, where Plaintiffs completely prevailed on novel, difficult issues.**

"Reasonable fees are … to be calculated according to the prevailing market rates in the relevant community." *Davis v. City & Cnty of San Francisco*, 976 F.2d 1536, 1545-46 (9th Cir. 1992), *vacated in part on other grounds*, 984 F.2d 345 (9th Cir. 1993) (internal quotations omitted). The reasonableness of market rates is determined by reference to the

3

rates of "lawyers of reasonably comparable skill, experience, and reputation" in the relevant community. *Id.* at 1546.

Additionally, current rates must be applied when calculating the lodestar to account for delay in payment over years of hard-fought litigation. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 282-84 (1989); *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 453-54 (9th Cir. 2010); *Bouman v. Block*, 940 F.2d 1211, 1235 (9th Cir. 1991). Courts appropriately recognize that rates, and inflation, increase over time. *Parker v. Vulcan Materials Co. Long Term Disability Plan*, 2012 WL 843623, at *7 (C.D. Cal. Feb. 16, 2012) (approving as reasonable an approximate 10 percent increase between 2011 rates and 2012 rates because: "It is common practice for attorneys to periodically increase their rates for various reasons, such as to account for expertise gained over time, or to keep up with the increasing cost of maintaining a practice.").

Moreover, it is irrelevant that Plaintiffs' attorneys do not charge these rates upfront to their civil rights clients, who would be unable to pay them. *Nadarajah v. Holder*, 569 F.3d 906, 916 (9th Cir. 2009) ("Important public policy considerations dictate that the court should not punish an 'undercharging' civil rights attorney, but instead must award attorneys' fees based on prevailing market rates.") (cleaned up). To fulfill the purposes of the fee-shifting statutes, the Court must examine whether the requested rates are in line with "the prevailing hourly rate in the local legal community for similar work by attorneys of comparable skill and experience." *Roberts v. City of Honolulu*, 938 F.3d 1020, 1025 (9th Cir. 2019).

"Congress made clear that it intended that the amount of fees awarded under § 1988 be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases." *City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986) (cleaned up); *see also Hensley*, 461 U.S. at 447 (noting that "judges awarding fees must make certain that attorneys are paid the full value that their efforts would receive on the open market in non-civil-rights cases") (Brennan, J., concurring in

4

part and dissenting in part). "In order to encourage able counsel to undertake [§ 1983] cases, as congress intended, it is necessary that counsel be awarded fees commensurate with those which they could obtain by taking other types of cases." *Camacho*, 523 F.3d at 981.

In *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109 (C.D. Cal. 2012), the court rejected the argument that rates at large, prestigious firms were invalid comparators. "First, the Supreme Court and Ninth Circuit have expressly endorsed comparisons to 'lawyers of reasonably comparable skill, experience, and reputation' and have never required prevailing party's counsel to also prove that their firm is the same size or has the same level of prestige as that of comparator attorneys." *Id*. at 1120 (citing *Blum*, 465 U.S. at 896 n.11). "Second, attorneys at large, prestigious law firms are valid comparators because they do, in fact, sometimes litigate civil rights cases." *Charlebois*, 993 F. Supp. 2d at 1121. Indeed, Mr. Wulkan previously litigated civil rights cases as the mainstay of his practice while working at Stinson LLP, one of the nation's largest law firms. Exhibit A ¶¶ 2-4, attached as **Exhibit A**.

Plaintiffs seek 2024 rates as follows: $630 for Mr. Moore, $450 for Mr. Wulkan, $350 for Ms. Allen, $350 for Mr. Weeks, $245 for Ms. Eisa, $215 for Ms. Slawson, $150 for Ms. T.[1] and $125 for Ms. Smith. The declarations of Plaintiffs' attorneys and fee expert Randy Papetti (**Exhibit D**), and their supporting exhibits establish that the requested hourly rates are reasonable.

1. Hourly Rate for Michael Garth Moore

Mr. Moore has been practicing law for 45 years. Exhibit B ¶ 4, attached as **Exhibit B**. During nearly all of that time, he has represented clients in various types of cases

---

[1] Ms. T's last name is redacted for privacy reasons. The undersigned is more than willing to disclose Ms. T's full identity to the Court or in subsequent filings. However, if that is the case, the undersigned requests that such discussion take place under seal for reasons that will become self-evident.

5

involving discrimination and civil rights violations. *Id*. While Mr. Moore's primary practice has been in Ohio and Arizona, he has also represented clients in other jurisdictions. *Id*. Recently, Mr. Moore has focused his practice, and achieved notoriety, in cases involving abuses by law enforcement, and in particular agents of the Arizona Department of Child Services. *Id*. Plaintiffs are requesting an hourly rate of $630 for Mr. Moore, which was the prevailing market rate for an attorney with his experience in 2020. *Id*. at ¶ 7; Exhibit D at ¶ 11. Thus, Plaintiffs are requesting a below market rate for Mr. Moore.

        2.        <u>Hourly Rate for Larry J. Wulkan</u>

Mr. Wulkan has been practicing law for 23 years. Exhibit A ¶ 2. He was a partner, for over a decade, at one of the nation's largest firms—Stinson LLP—before founding Zwillinger Wulkan LLP. *Id*. at ¶ 2. For the majority of the time Mr. Wulkan has practiced, he has represented clients in cases brought under 42 U.S.C. § 1983. *Id*. at ¶ 3 (detailing extensive experience representing clients in substantial civil rights cases). In addition to serving as lead counsel at trial, Mr. Wulkan has argued cases before the Ninth Circuit Court of Appeals, the Arizona Supreme Court and the Arizona Court of Appeals (both divisions). *Id*. Although not arguing the case, Mr. Wulkan has also represented clients before the United States Supreme Court. *Id*. In addition, Mr. Wulkan regularly provides expert testimony on the reasonableness of requested fees and costs. *Id*. at ¶ 5. Plaintiffs are requesting an hourly rate of $450 for Mr. Wulkan. *Id*. at ¶ 16. That rate is *below* market and what he was charging, and getting, at Stinson, in 2020. *Id*. at ¶ 17; Exhibit D at ¶ 11.

        3.        <u>Hourly Rates for Jennifer Allen, Robert Weeks, and Alexis Eisa</u>

Ms. Allen has been practicing law for 14 years; Mr. Weeks 17 years. *Id*. at ¶ 8, 9. They both graduated summa cum laude from Arizona law schools. *Id*. And they both have substantial litigation experience at both large and small firms. *Id*. Out of law school, Ms. Allen clerked for the Arizona Court of Appeals; Mr. Weeks went to work at Osborn Maledon, PA. *Id*. Plaintiffs are requesting an hourly rate of $375 for Ms. Allen and $350 for Mr. Weeks. *Id*. at ¶ 16. These rates are below market. *Id*. at 17; Exhibit D at ¶ 13.

6

Ms. Eisa is a first year Associate at Zwillinger Wulkan. *Id*. at ¶ 10. She graduated from the Sandra Day O'Connor College of Law, where she was the Associate Editor of Law Journal for Social Justice. *Id*. While in law school, Ms. Eisa obtained numerous honors and achievements. *Id*. Plaintiffs are requesting an hourly rate of $245 for Ms. Eisa, which is slightly below the market rate for lawyers of similar experience. *Id*. at ¶¶ 16-17; Exhibit D at ¶ 13.

4. <u>Hourly Rates for Paralegals</u>

Anne Slawson is a Paralegal at Zwillinger Wulkan. Ms. Slawson has over 27 years of experience in the industry. Exhibit A at ¶ 11. Ms. Slawson has been intimately involved in some of the largest civil rights cases in Arizona history, including many involving Plaintiffs bringing claims under 42 U.S.C. § 1983. *Id*. In this case, Ms. Slawson was integral in assisting Mr. Wulkan in preparing for witness examinations. Plaintiffs are requesting an hourly rate of $215 for Ms. Slawson. *Id*. at ¶ 16; Exhibit D at ¶ 13.

Brittany T. is a Paralegal at Zwillinger Wulkan with over 16 years of experience in the legal profession. *Id*. at ¶ 12. Brittany earned two Bachelors of Arts degrees from ASU and a post-degree Paralegal Certificate from Phoenix College. *Id*. She is a member of NALA and holds an Advanced Certified Paralegal credential in eDiscovery. Prior to joining Zwillinger Wulkan, Brittany trained the legal community in, and designed curriculum for, Legal Hold, eDiscovery, and Trial software applications. Her extensive knowledge in this arena makes her an integral part of our eDiscovery collection and management processes. *Id*. Brittany assisted in this case with document management and trial preparation. Plaintiffs are requesting an hourly rate of $195 for Brittany. *Id*. at ¶ 16; Exhibit D at ¶ 13.

Tricia Jochum was a Paralegal at both Mr. Moore's office and Zwillinger Wulkan LLP. She holds a Bachelor of Arts from the University of Arizona, with a focus on journalism, Communications and Media Arts. *Id*. at ¶ 13. Ms. Jochum earned a post-degree Paralegal Certificate from Pima Community College and is a Board Member and Parliamentarian for the Tucson Paralegal Association. *Id*. For the majority of the pre-trial life of this case, Ms. Jochum was the primary paralegal involved in the collection of documents, discovery of facts, and

organization of the case file. *Id*. Plaintiffs are requesting an hourly rate of $175 for Ms. Jochum. *Id*. at ¶ 16; Exhibit D at ¶ 13.

Amber Pierides is a Paralegal at the Law Offices of Michael Garth Moore. Ms. Pierides is a member of NALA, as well as the Maricopa County Bar Association. Ms. Pierides has extensive experience in litigation, including family and employment law. Ms. Pierides obtained her Paralegal Certificate from the University of Hartford, in Hartford, Connecticut. Prior to her time with the Law Offices of Michael Garth Moore, Ms. Pierides worked with the Connecticut Bar Association, training other paralegals and assisting in the pro bono clinics offered by the Bar every year. *Id.* at ¶ 13. Plaintiffs are requesting an hourly rate of $175 for Ms. Pierides. *Id.* at ¶ 16; Exhibit D at ¶ 13.

The hourly rates requested for the paralegals in this case, given their abilities, training, education, experience and skill are below market rates. *Id*. at ¶ 17; Exhibit D at ¶ 13.

**B.    The hours Plaintiffs' attorneys expended were reasonable, especially given counsels' substantial and appropriate billing judgment reductions.**

Prevailing plaintiffs are entitled to compensation for "every item of service which, at the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982) (citation omitted). The work on the merits and on the fee application in this Court is outlined in the Exhibit B ¶¶ 11-12, and Exhibit A ¶¶ 15-20 and accompanying time records, Exhibit B at Ex. 2, Exhibit A at Ex. 1.

In accordance with Civil Local Rule 54.2(e), the contemporaneous time records contain a detailed itemization of the tasks performed, including the amount of time spent by Plaintiffs' lawyers, paralegals, and staff, as well as explanations of the time incurred. These time records show that merits work was staffed by a small and efficient group of attorneys, led by Mr. Moore, who was lead counsel for the duration of the merits litigation. Exhibit B ¶¶ 1, 9. Further, Mr. Moore and professionals at Zwillinger Wulkan divided tasks so as to use timekeepers who would most efficiently handle certain tasks, thereby

8

leveraging each firm's relative strengths and efficiencies. *Id.* at ¶ 9; Exhibit A at ¶ 20. Both Mr. Moore and Zwillinger Wulkan made appropriate billing judgment reductions of both their merits and their fee application work, based on the same careful review of the billing records that is typically conducted prior to sending a bill to a fee-paying client. See Exhibit B ¶ 9; Exhibit A ¶ 21. Those reductions included, among other things, eliminating purely administrative time, time billed by personnel who were not core team members, and not charging for time that was inefficient or unduly duplicative. Exhibit B ¶ 10; Exhibit A ¶ 21. In addition to these reductions, some time was not claimed because it was not recorded. Exhibit B ¶ 9; Exhibit A ¶ 21. Similar billing judgment reductions were made as to work on this fee application. Exhibit A ¶ 15. Zwillinger Wulkan would have made such an adjustment for a private hourly client. *Id.*

**C.     Plaintiffs should be awarded their attorney's fees as requested for litigating this fee application.**

Plaintiffs are entitled to recover their attorneys' fees incurred in preparing and litigating this fee application. *See Thompson v. Gomez*, 45 F.3d 1365, 1366 (9th Cir. 1995). Counsel's fees for work on this application through the date this petition was filed comes to a total of $21,813.00. *See* Exhibit A ¶ 18; Exhibit B ¶ 11. Plaintiffs will submit documentation of additional time with Plaintiffs' reply papers, including a projection of time through any hearing on this motion. Exhibit A ¶ 24.

**III.   PLAINTIFFS REQUESTED AWARD IS REASONABLE AS MEASURED BY THE *KERR* FACTORS.**

Local Rule 54.2(c)(3) requires discussion of the factors announced in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), whereby courts, after making the lodestar computation, assess whether it is necessary to adjust the presumptively reasonable lodestar. *See Cunningham v. Cnty. of Los Angeles*, 879 F.2d 481, 487 (9th Cir. 1988); *Morales v. City of San Rafael*, 96 F.3d 359, 364 n.9 (9th Cir. 1996). The *Kerr* factors confirm that Plaintiffs' requested fee award is reasonable.

9

### A.    The time and labor required.

As demonstrated above, this case was hard-fought by the State of Arizona, who indemnifies and defends DCS employees. Discovery was grueling, long and complex, given the unique facts of C.S.'s diagnosis, treatment and history, about which this Court heard evidence. Plaintiffs successfully overcame a motion for summary judgment. Defendants then filed the interlocutory appeal. The litigation of the Fourteenth Amendment claim involved the same nucleus of operative facts as Plaintiffs' improper removal claim, which was voluntarily dismissed so the case could go to trial.

Importantly, Plaintiffs could not have received the outstanding result reflected by the verdict, and anticipated judgment, without going through the full litigation process. In April of 2020, Plaintiffs offered to settle this matter for $300,000. Defendants rejected the offer. In December of 2021, Plaintiffs offered to settle this matter for $400,000. Defendants rejected the offer. At a settlement conference in May of 2022, the Steins again offered to settle this matter for $400,000. Defendants, this time, offered to settle for $20,000 (which did not even cover a fraction of the cost of defense for the rest of the matter and certainly not the known risk from a verdict). On the eve of trial, Defendants made an offer of judgment for a *total* of $100,000.[2]

Defendants' unreasonable offers to settle this case, in light of the clear risks it presented, show that the time and labor required for its prosecution was completely appropriate.

Moreover, this case was staffed efficiently with a small team of attorneys and support staff who took care to avoid unnecessary duplication of work, while leveraging each office's relative strengths and efficiencies. Exhibit A ¶¶ 6, 20. All the work was necessary

---

[2] Rule 68(b) specifically provides that evidence of an offer is admissible in "a proceeding to determine costs." The Civil Rights Attorney's Fees Awards Act of 1976 is one of a number of federal fee shifting statutes that allow a prevailing party to recover "a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

and performed by skilled counsel and staff whose experience and expertise contributed to the efficiency of their work and the exceptional results obtained. Exhibit A ¶ 20.

### B.     The novelty and difficulty of the issues.

The legal and factual issues in this case were complex, requiring the time and skill that is demonstrated both by the superior quality of counsels' work in the district court, and by the results obtained. Plaintiffs were unable to find any other case, in Arizona or elsewhere, where a judicial deception claim went to trial following misrepresentation to a court from a social worker. Moreover, Plaintiffs were challenged by the mere fact that they were seeking damages against a public employee. This was highlighted by Defendants' opening statement where it was claimed that Plaintiffs were dragging Defendants "through the mud" for doing nothing but their jobs.

Public employees, including representatives of the Arizona Department of Child Safety, by and large occupy a positive image in the public's mind. This was evident by many of the responses to the juror questionnaires that the Court reviewed. This imposes an unstated elevation of the burden on persons suing for civil rights violations. Moreover, there is an undeniable reluctance in some individuals to impose liability on public employees because of concern for unpleasant consequences of participation in such verdicts. This factor, along with those that follow, have caused lawyers who represent victims of wrongful conduct to shy away from cases against public entities. There are only a handful of practitioners in the entire State of Arizona who take on cases like this one.

Congress recognized the potential complexity of civil rights cases. The legislative history states that: "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. § 1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011, 1976 U.S. Code Cong. & Admin. News at 5913.

### C.     The skill required to perform the legal services.

11

As thoroughly documented in the Moore, Wulkan and Papetti declarations, Plaintiffs' counsel demonstrated exceptional skill in litigating this case. This skill has been acquired through their extensive experience litigating civil rights cases on behalf of victims of government abuse and is further evidenced by their longstanding success rate in doing so to achieve an exceptional result. Exhibit B at ¶¶ 4-6; Exhibit A at ¶¶ 3-5; Exhibit D at ¶ 10.

**D.      The preclusion of other employment by the attorneys involved in the case.**

Mr. Moore was responsible for the majority of the hours devoted to Plaintiffs' cause, and, as a solo practitioner, was precluded from accepting new, potentially fee-generating work while working on this case. Mr. Moore receives approximately ten inquiries per week from people seeking legal representation in employment and civil rights cases. Exhibit B ¶ 8. He conducts a detailed evaluation for approximately 5% of those inquiries and charges an hourly fee for those consultations. *Id.* However, in cases which have an immediate appearance of merit – this case being one – Mr. Moore conducts a complete evaluation without taking a fee. *Id.* He then converts hourly fee arrangements to fee litigation agreements upon the determination of viable claims. Approximately one (1) in three (3) cases Mr. Moore takes on evaluation move to litigation on a mixed hourly/contingent agreement. Given that he is a solo practitioner, he has declined numerous opportunities over the four-plus years of this representation. He referred numerous inquiries to other lawyers in order to focus on this case at critical points. Thus, in the relevant period, Mr. Moore estimates having declined between ten (10) and twenty (20) paid hourly evaluations and estimated three (3) to five (5) litigation cases because of demands on his time in this case. *Id.* at ¶ 8.

Zwillinger Wulkan attorneys were also limited in the other new work they could take on over the course of their involvement in this case. Exhibit A ¶ 19.

**E.      The customary fee in similar litigation.**

12

Plaintiff's counsel has provided the market hourly rates for their attorneys and other staff, which are reasonable and should be awarded. Exhibit B ¶ 11; Exhibit A ¶ 16. As Mr. Papetti testified in his declaration: "I can confidently testify that the time spent, the resources devoted, and the total amount of fees requested are reasonable. If one of the larger Arizona law firms would have handled this matter, it is very likely that the total fees would have been significantly higher without any elevation in the quality of representation." Exhibit D at ¶ 15.

**F.  Contingent fee agreement.**

Plaintiffs were represented on a contingent basis. Consistent with LRCiv 54.2(d)(2), a complete copy of the fee agreement is attached as **Exhibit C**.

**G.  Time limitations imposed by the clients or circumstances.**

Mr. Wulkan was called in belatedly and at a critical juncture in this case, shortly after Defendants filed a motion for summary judgment. Zwillinger Wulkan came into the case at the end of September 2022, and it was necessary for Mr. Wulkan and Ms. Allen to quickly get up to speed on the facts of the case in order to assist in preparing a response to that motion. This required Mr. Wulkan to delay work for existing clients in order to meet the demands of this case. Exhibit A at ¶ 19. In addition, Mr. Wulkan was not nearly as familiar with the case as Mr. Moore, As trial approached, Mr. Wulkan needed to get up to speed on some of the details for the witnesses he would be taking at trial. That required him to review the relevant exhibits and annotate deposition transcripts in order to gain the necessary familiarity, which took time away from other matters. *Id.*

**H.  The results obtained.**

The result of the trial was, by any measure, outstanding. Its import exceeds the monetary awards to Plaintiffs. As the Ninth Circuit recognizes: "A civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *Morales*, 96 F.3d at 364 (*quoting City of Riverside*, 477 U.S. at 574 (plurality opinion)). That is because "there is perhaps no more profound contradiction, or

more fundamentally harmful personal injury than when deprivations of civil rights are inflicted by the state itself: when constitutional offenses are committed, through actions directly authorized or taken under the color of law, by the very government agents whose public duties encompass protecting individual rights, promoting social values and promulgating fair and just behavioral norms." *Banks ex rel. Banks v. Yokemick*, 177 F. Supp. 2d 239, 260-61 (S.D.N.Y. 2001) (citing *Owen v. City of Independence*, 445 U.S. 622, 651 (1980) ("How 'uniquely amiss' it would be, therefore, if government itself—'the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment and the setting of worthy norms and goals for social conduct'—were permitted to disavow liability for the injury it has begotten.").

The jury's verdict sent a message to DCS specialists and supervisors throughout this State—and beyond—that they will be held accountable for ignoring a family's fundamental right to be together without interference, particularly when that interference is accomplished by judicial deception. Because of the paucity of lawyers in this state willing and able to take on these complex cases—as opposed to, for example, California—every victory, no matter how modest the damages awarded might be, must be viewed as having conferred a meaningful public benefit.

**I.     The experience, reputation, and ability of counsel.**

Plaintiffs' lawyers have unquestionable expertise in civil rights actions, which justifies the requested award. *See* Exhibit B ¶¶ 4-7; Exhibit A ¶¶ 3-5.

**J.     The undesirability of the case.**

Because civil rights laws depend heavily on private enforcement, "fee awards have proved an essential remedy if citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." S.Rep.No. 94-1011, 1976 U.S. Code Cong. & Ad. News at 5910. Thus, the attorney's fee statute was designed "to promote the enforcement of the Federal civil rights acts, as Congress intended, and to achieve uniformity in those statutes and justice for all citizens." H.R.Rep.No. 94-1558,

94th Cong., 2d Sess. 1, 19 (1976). *See also* Remarks of Senator Tunney, 122 Cong.Rec. 33313 (Sept. 29, 1976); Remarks of Congresswoman Holtzman, 122 Cong.Rec. 35127 (Oct. 1, 1976) ("The act will help to assure that all Americans can have access to the courts to obtain the protections against discrimination contained in our laws and the Constitution."). Congress intended to facilitate the effective implementation of civil rights laws by all citizens, and to prevent those laws from becoming "mere hollow pronouncements which the average citizen cannot enforce." S.Rep.No. 94-1011, 1976 U.S. Code Cong. & Ad. News at 5913.

Even when plaintiffs are able to establish that DCS workers demonstrated deliberate indifference, DCS workers are protected by absolute immunity for some of their acts and qualified immunity for others. These immunities frequently prevent the case from reaching a jury at all. "Practically, qualified immunity shuts the courtroom door on civil rights plaintiffs and allows defendant-public officials to duck consequences for bad behavior. As Justice Sotomayor once pointed out, the Supreme Court's current approach risks rendering the qualified immunity doctrine 'an absolute shield for law enforcement officers.'" Michael E. Beyda, *Affirmative Immunity: A Litigation-Based Approach to Curb Appellate Courts' Raising Qualified Immunity Sua Sponte*, 89 Fordham L. Rev. 2693, 2702 (2021) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting)). Indeed, "some scholars worry that even nonfrivolous lawsuits are weeded out by qualified immunity." Jesus A. Alonso, *How Police Culture Affects the Way Police Departments View and Utilize Deadly Force Policies Under the Fourth Amendment*, 60 Ariz. L. Rev. 987, 1012 (2018).

By all objective counts, this case was "undesirable" because of its difficulty.

**K.    The nature and length of the attorney-client relationship.**

Mr. Moore has represented the Steins since the inception of this litigation four years ago. This representation, at times, has not been easy due to the couple's divorce which they, at least in part, blame on the events that gave rise to this matter.

15

### L. Awards in similar actions.

To the undersigned's knowledge, this is the very first verdict in a judicial deception case against a social worker for an agency like DCS. This means that there was no "playbook" to this case and this factor weighs in Plaintiffs' favor, similar to the novelty of the case which is discussed above.

## IV. PLAINTIFF IS ENTITLED TO RECOVER LITIGATION EXPENSES.

A reasonable attorneys' fee includes reimbursement for expenses incurred in the litigation. *See Woods v. Carey*, 722 F.3d 1177, 1179 n.1 (9th Cir. 2013) (42 U.S.C. § 1988 "allows for recovery of reasonable out-of-pocket expenses that would normally be charged to a fee paying client," including "photocopying, paralegal expenses, and travel and telephone costs" (internal quotation marks, citations omitted)). The expenses for which reimbursement is sought include, but are not limited to, photocopying, out-of-town travel (e.g. meals and hotel), postage and courier fees, transcripts, Westlaw research charges, PACER charges, and other expenses that would typically be billed to clients. Exhibit A ¶ 22; Exhibit B ¶ 12. These expenses are reasonable. *See* Exhibit D at ¶ 14. Any of Plaintiffs' statutory costs, which are not included in this petition, will be the subject of a Cost Bill that will be filed following the entry of judgment.

## V. CONCLUSION.

For the foregoing reasons, Plaintiffs respectfully request that the Court award them $736,756.00 in attorneys' fees, for merits work done through June 28, 2024, $21,813.00 in fees for work on this fee petition, and $16,084.85 in expenses incurred as of June 28, 2024. In total, Plaintiffs seek $774,653.85 in fees and expenses.[3]

---

[3] Plaintiffs' statement of consultation is attached as **Exhibit E**.

16

RESPECTFULLY SUBMITTED this 15th day of July, 2024.

/s/ Larry J. Wulkan
Larry J. Wulkan
Jennifer L. Allen
2020 N. Central Ave., Suite 675
Phoenix, Arizona 85004
Telephone: 602-609-3800
larry.wulkan@zwfirm.com

Michael Garth Moore
6336 North Oracle Road Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-318-0075
mike@mgmoorelaw.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing was filed through the Court's electronic filing system on July 15, 2024. Notice of this filing will be sent to all parties and counsel through the Court's filing system. Parties and counsel may access the filing through the Court's system.

/s/ Stephanie Dolfini