**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Justin Stein, et al., | No. CV-20-00102-TUC-JCH |
| Plaintiffs, | **ORDER RE: MOTION FOR NEW TRIAL OR REMITTITUR** |
| v. | |
| Alyssa Depke, et al., | |
| Defendants. | |

Before the Court is Defendant Lyssa Fregoso's Amended Motion for New Trial or, Alternatively, for Remittitur (the "Motion"). Doc. 295. The Motion is fully briefed, Doc. 305 and Doc. 318, and suitable for resolution without oral argument. Below, the Court grants the Motion in part. More specifically, the Court grants remittitur as to the damages awarded to CS and reduces his award to $30,000. The Court denies the rest of the Motion.

## I.    Background

Plaintiffs, Justin and Jacqueline Stein and their minor son, CS, alleged Defendant violated their Fourteenth Amendment right to familial association by committing judicial deception. Specifically, Plaintiffs alleged Defendant, a DCS supervisor, submitted a materially misleading dependency petition that resulted in temporary orders that wrongfully separated the Steins from their minor son. A two-week jury trial occurred in April 2024. The jury found for Plaintiffs and awarded compensatory damages totaling $1,101,300 and punitive damages totaling $100,000. Defendant requests a new trial or, alternatively, remittitur.

## II.     Legal Standard

Federal Rule of Civil Procedure 59(a)(1)(A) permits the Court to order a new trial "on all or some of the issues, and to any party . . ., after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court. . . ." Recognized grounds for a new trial "include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The Court "may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000) (citation omitted). Unlike a Rule 50 motion, a district court reviewing a motion for a new trial has "the duty, to weigh the evidence as [the Court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence," where the Court believes "the verdict is contrary to the clear weight of the evidence," or to prevent a miscarriage of justice. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957)). Erroneous or inadequate jury instructions may also justify a new trial. *Id.*

In ruling on a motion for new trial, the Court has the right and the duty to "weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Air–Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 190 (9th Cir. 1989) (citations and quotation marks omitted). However, a court may not upset the verdict "merely because it might have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (quotation marks and citation omitted). "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." Fed. R. Civ. P. Rule 61.

III.    **Analysis**

Defendant argues the trial was tainted by error and unfair prejudice. Specifically, Defendant argues a new trial could be granted for any of five reasons: (1) Plaintiffs gave surprise testimony; (2) the verdict is against the clear weight of the evidence; (3) the Court improperly excluded exculpatory evidence; (4) Plaintiffs' counsel committed misconduct; and (5) the jury instructions were inadequate. In the alternative, Defendant claims the damages were grossly excessive and requests remittitur or a new trial on damages.

As a threshold matter, Defendant waived most of her arguments by not objecting at trial. Before and during the trial, the Court reminded the parties the Court would entertain objections and provide clarification on various evidentiary and procedural issues.[1] Nevertheless, Defendant rarely objected and now raises numerous alleged errors for the first time in post-trial motions.

a.  **Unfair Surprise**

Defendant asserts Plaintiffs changed positions at trial and thereby deprived her the opportunity to prepare an unclean hands defense. Specifically, she alleges Plaintiffs revealed for the first time at trial that they "lied" to DCS about neglecting CS, to "jump the queue of other families waiting for services." Doc. 295 at 5.[2] Relying on *Ruiz v. Hamburg-American Line*, 478 F.2d 29, 34 (9th Cir. 1973), Defendant argues that a "surprise change in position by a party while giving testimony justifies a new trial." Doc. 295 at 2. As discussed below, this case is nothing like *Ruiz*. Defendant's request for a new trial on these grounds fails for three reasons: Defendant waived the argument; there was no unfair surprise; and an unclean hands defense is unavailable in this case.

i.  **Defendant Waived this Argument by Not Objecting.**

Typically, the remedy for genuine surprise at trial is to object and move for a continuance to allow time to properly rebut the new information. *Moylan v. Siciliano*, 292

---

[1] *See, e.g.*, Doc. 253 at 10:19–20 ("If you need a ruling from me on a designation, ask me for a ruling."); Doc. 254 at 65:11–14 ("If it becomes a problem at trial . . . and I start to hear arguments that I think cross a line, you can raise your objections at that time."); 66:12–22 ("I'm [not] in a position to give you a ruling at this point . . . But . . . you can raise those [issues at trial] when I have more information.").

[2] Record citations are to CMECF document and page numbers unless otherwise indicated.

F.2d 705, 705 (9th Cir. 1961). For example, in *Ruiz*, one party offered a surprise defense on the final afternoon of a ten-day trial, and the surprised party preserved the error by moving for a continuance. 478 F.2d at 30–31. Here, the allegedly offending testimony initially surfaced on day three of a nine-day trial. But Defendant did not object then or at any time thereafter. *See* Doc. 220 at 69:21–23. Instead, Defendant tried to exploit the admission. Counsel proactively elicited more testimony that Plaintiffs acted duplicitously. *See* Doc. 221 at 10:3–12:21; Doc. 225 at 55:16–57:21. In closing argument, Defendant suggested Justin "probably wasn't lying back then [when they first called DCS] because they needed help, and they wanted DCS to help." Doc. 262 at 51:12–18. Defendant argued that Justin lied to the jury at trial and described Justin's "lie" as one of two "nails in the coffin" to Plaintiffs' case. Doc. 262 at 51:1–18, 55:20–24. These arguments apparently failed to persuade the jury and, post-trial, Defendant wants a mulligan. The holding in *Porterfield v. Burlington Northern Inc.* is particularly instructive:

> [Plaintiff] believed he had caught [Defendant] in an embarrassing position and, as a matter of trial strategy, decided to ride the horse for all it was worth rather than attempt to start anew. The lack of objections and failure to move for a mistrial at any time are ample evidence that a trial strategy decision had been reached. That it was, in hindsight, the wrong decision is not a ground for reversal.

534 F.2d 142, 146 (9th Cir. 1976). Like the plaintiff in *Porterfield*, Defendant waived the argument. *See United States v. Rivera*, 43 F.3d 1291, 1295 (9th Cir. 1995).

### ii.  There Was No Unfair Surprise at Trial.

To claim unfair surprise, the movant must show the surprise evidence could not have been discovered earlier, despite exercising due diligence. *Moylan*, 292 F.2d at 705. Here, Defendant states in conclusory fashion that the Steins "revealed for the first time [at trial] that they had decided together to call DCS and lie." Doc. 295 at 4:3–4. Defendant does not provide a discovery response or deposition testimony by the Steins to support this assertion or clearly show how the Steins changed position between discovery and trial. *See* Doc. 295 at 2–4.

The available record does not support Defendant's position. Throughout discovery

and trial, Plaintiffs provided a consistent narrative for how they ended up calling DCS and reporting themselves for neglect. In depositions and summary judgment briefings, Plaintiffs stated Crisis Mobile Team worker Caren Jablonsky suggested calling DCS, "Jackie made the call at the direction of Jablonsky," and "Jablonsky dictated to Jackie what words to use." Doc. 305-1 at 13–14; Doc. 96 at 8:12–13, 9:12; Doc. 96-3 at 16. During their depositions, Justin and Jackie both expressed hesitation about calling DCS. Doc. 305-1 at 14 (Justin: "Yes [we had] . . . concerns [about] calling DCS"); id. at 4 (Jackie: "I felt like we didn't have a choice."). Defendant also gave Jackie a transcript of the DCS hotline call and asked Jackie to highlight the exact phrases she claimed Jablonsky coached her to say. Doc. 96-3 at 16:8–24; see also Doc. 220 at 68:3–11; DCS Hotline Tr., Trial Ex. 2 at 2–3. During depositions, Defendant could have further explored the DCS call and the motives behind the call. Defendant could have asked the Steins if the statements Jablonsky told Jackie to make to DCS were true. Such questions were apparently not asked.

At trial, Plaintiffs testified consistent with their deposition testimony: Jablonsky suggested calling DCS and Jablonsky told Jackie what to say. Doc. 218 at 94:6–95:5; Doc. 220 at 58:7–23, 63:15–64:16, 68:25–70:10; Doc. 224 at 52:3–53:11; Doc. 225 at 54:10–12, 84:18–85:23. But, unlike at deposition, Defendant pressed Jackie on cross examination to clarify whether the statements Jablonsky told Jackie to make were true. Doc. 220 at 69:22–23; Doc. 221 at 10:3–12:21. Jackie testified some of the statements were true and some were not. *Id.* Then, again on cross-examination, Justin agreed with Defendant's characterization that, in retrospect, the Steins essentially lied to DCS to get help:

> Q. So you decided to call this in as a neglect case even though you didn't actually think you were neglecting your son, correct?
> A. Correct.
> Q. So you both agreed to call DCS and lie to get them to your house, correct?
> A. Correct.

Doc. 225 at 56:7–13.

On redirect, Justin walked back this admission:

> Q. Did you lie?

A. I don't -- I don't think I did.

Q. Explain to the jury why you don't think you lied.

A. We were told by Jablonsky that if we didn't say certain things in a certain way, they weren't going at the [sic] help us get the care we needed for [CS].

Doc. 225 at 85:18–23.

Here, the defense extracted certain concessions from the Steins on cross examination, which is not unusual, and then tried to exploit those concessions in closing argument. In contrast, in *Ruiz*, a party intentionally misled the opposing party into believing a specific defense would not be offered, then relied heavily on that defense in closing argument. 478 F.2d at 32–34. The court granted a new trial based on "surprise, misrepresentation, and prejudicial argument." *Id.* at 32. Defendant has provided no proof that Plaintiffs took a definitive position during discovery and then blindsided them by changing that position at trial. And the Court strains to see how Defendant could have been truly surprised by Plaintiffs' trial testimony when Defendant framed the questions and pushed Plaintiffs to make the admissions about "deceiving" DCS about which they now complain.

### iii.  Defendant Has Not Shown an Unclean Hands Defense Is Viable.

The doctrine of unclean hands is an affirmative defense arising out of equity. *Metal Jeans, Inc. v. Metal Sport, Inc.*, 987 F.3d 1242, 1243 (9th Cir. 2021). It "generally applies to prevent a party from obtaining equitable relief and profiting from their own misconduct." *Acasio v. Lucy*, No. 14-CV-04689-JSC, 2017 WL 1316537, at *13 (N.D. Cal. Apr. 10, 2017) (quoting *Ganley v. Cnty. of San Mateo*, No. C06-3923 TEH, 2007 WL 902551, at *5 (N.D. Cal. Mar. 22, 2007)). Still, Defendant argues that unclean hands could also defend against a § 1983 claim for compensatory damages. Doc. 295 at 3–4. Defendant has not cited, nor can the Court find, any authority or case to support this proposition. Defendant's strongest argument is that some courts have occasionally allowed an unclean hands defense to survive the pleadings stage, or, even rarer, summary judgment. *See Acasio*, 2017 WL 1316537, at *13–14 (collecting cases, most decided at the pleadings stage). Defendant has the burden here and she has failed to provide convincing authority that an unclean hands

defense is available under these circumstances. The Court remains unpersuaded and concludes an unclean hands defense is unavailable.

Further, an unclean hands defense here would be meritless. To invoke a defense of unclean hands, Defendant must show by clear and convincing evidence that (1) Plaintiff acted with "wrongfulness, willfulness, bad faith, or gross negligence" and (2) Defendant was personally injured by Plaintiff's conduct. *See Pfizer, Inc. v. Int'l Rectifier Corp.*, 685 F.2d 357, 359 (9th Cir. 1982); *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 990 (9th Cir. 2009). As to the second prong—even if Plaintiffs had acted with nefarious motives—Jackie calling the DCS hotline did not "personally injure" Defendant(s).

### b. The Weight of the Evidence

Defendant argues that the verdict is not supported by the clear weight of the evidence. Doc. 295 at 5. Defendant alleges she presented "overwhelming evidence" that her statements were not reckless, she made none of the misrepresentations or omissions listed in the Joint Pretrial Order ("JPTO"), and Plaintiffs failed to prove injury. *Id.* at 6–9. Defendant also argues the Court failed to properly restrict Plaintiffs to the bounds of the JPTO and that Plaintiffs impermissibly attacked the quality of the DCS investigation. *Id.* at 9–10.

### i. The Verdict is not Against the Clear Weight of the Evidence.

To determine whether a new trial is warranted, it is not enough to find sufficient evidence for the verdict. The court must also weigh whether the verdict goes against the clear weight of the evidence. "Doubts about the correctness of the verdict are not sufficient grounds for a new trial: the trial court must have a firm conviction that the jury has made a mistake." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987).

The Court addressed the bulk of Defendant's arguments in the previous Order denying Defendant's Renewed and Supplemental Motion for Judgment as a Matter of Law. *See generally* Doc. 329. That Order identified evidence that the Court found sufficient to support the jury's verdict. *Id.* at 3–11. The Court incorporates that analysis here.

To the Court, the most salient issue throughout the case was the repeated allegation in the removal petition that Justin and Jackie were "unwilling" to care for CS. Under A.R.S. § 8-201(25)(a), a child is in danger of neglect if a parent is unwilling or unable to provide necessary care. The petition alleged four times the Steins were "unwilling" to care for CS. Annotated Dependency Petition, Trial Ex. 34 at 4–6. Given that CS was vulnerable as a nonverbal child on the autism spectrum, it's difficult to imagine a juvenile court *not* taking swift action based solely on the allegation that the Steins were "unwilling" to care for CS and wanted him removed from their home. Here, there was evidence from which a jury could find that, prior to the dependency petition's filing, Defendant was aware Plaintiffs were willing to care for CS and wanted him back in the home. *See e.g.*, Doc. 259 at 9:14–10:10, 33:25–37:18. But the Petition said the opposite. There is sufficient evidence to support the verdict based on this alleged misrepresentation alone.

### ii.  Defendant Did Not Object.

Defendant argues Plaintiffs impermissibly provided testimony and argument at trial beyond the scope of the JPTO and the Court's pretrial rulings. Doc. 295 at 9–12. Accordingly, Defendant appears to argue that the Court cannot consider any such evidence or testimony as supporting the verdict. *Id.*

The purpose of the JPTO, created under Rule 16(e), is to prevent unfair surprise by narrowing "the scope of the suit to those issues that are actually disputed" and eliminating "other would-be issues that appear in other portions of the record of the case." *S. Cal. Retail Clerks Union and Food Employers Jt. Pension Tr. Fund v. Bjorklund*, 728 F.2d 1262, 1264 (9th Cir. 1984). A JPTO should be "liberally construed to permit evidence and theories at trial that can fairly be said to be embraced within its language." *United States v. First Nat. Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981).

In the JPTO, Plaintiffs stated that one of the contested issues of fact was whether Defendant "intentionally and recklessly made certain misrepresentations" and omissions in the dependency petition. Doc. 147 at 6. Plaintiffs stated these included "but [were] not limited to" nine specific examples of misrepresentations or omissions. *Id.*

Defendant filed a motion in limine arguing Plaintiffs did not properly disclose a theory of liability based upon alleged "omissions" and the proper remedy for this was exclusion. Doc. 148 at 3–4. The Court denied the motion in limine, finding Plaintiffs had broadly alleged several omissions in the Complaint that corresponded to omissions listed in the JPTO. Doc. 254 at 42:22–43:25. But the Court agreed with Defendant that Plaintiffs' trial testimony and allegations should be limited to the deceptions and omissions identified in the JPTO. *Compare* Doc. 148 at 1 ("Plaintiffs should at the very least be limited to the deceptions/omissions in the JPTO."), *with* Doc. 254 at 43:25–44:5 ("I think it is correct to say that the expectation of the Court is that the Plaintiffs . . . will [be] limit[ed to] those allegations [in the JPTO], and any testimony will be related to those points.").

The Court was prepared to sustain objections to any testimony that went beyond the issues identified in the JPTO. But defense counsel did not object to any of the instances where Defendant now claims Plaintiffs crossed a line. *See, e.g.*, Doc. 295 at 8–10, 13–18. Defendant seems to be asserting that it was the Court's role to keep Plaintiffs' testimony and argument within the bounds of the JPTO. Doc. 295 at 10:15–19. It is not the Court, but rather the "[l]itigants [who] are required to be reasonably alert at trial in the protection of their own interests." *Moylan*, 292 F.2d at 705.

A similar issue arose in *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054 (9th Cir. 2022). There, the defendant, H&M, obtained a favorable pretrial ruling from the judge to limit the scope of a lay witness's testimony. In post-trial motions, H&M argued that the lay witness's trial testimony improperly strayed into expert opinion. The Ninth Circuit found H&M failed to preserve this error by not objecting:

> H&M simply did not object nor move to strike any of [the] statements as Federal Rule of Evidence 103(a)(1)(A) requires. Nor could H&M argue that it need not have objected nor moved to strike them from the record due to the district court's pretrial ruling on H&M's motion in limine, as there was no "definitive" ruling as to the admissibility of the statements on the record. *See* Fed. R. Evid. 103(b). The district court had carefully explained [what] it would permit . . . Thus, to preserve the error . . . H&M was required to raise a timely objection to . . . testimony that ultimately went beyond the scope of the district court's pretrial in limine ruling to obtain a "definitive" ruling on

the record.

***

H&M could not rest on its prior objection [via the motion in limine]; it had to renew that objection at trial or move to strike [the witness]'s testimony. H&M failed to do either. Therefore, it has forfeited any claim of error. . . .

*Id.* at 1072 (internal citations omitted).

Defense counsel concedes they did not object, relying on Federal Rule of Evidence 103(b). Doc. 295 at 14 n.5. But Rule 103(b) only applies once the court makes a definitive ruling, and, critically, not until after counsel *makes* an objection in the first place. *See* Rule 103(a) (requiring a timely objection to preserve a claim of error). Far from ruling definitively at the final pretrial conference, the Court merely found that some but not all omissions would be admissible. Doc. 254 at 42:22–44:5. Defendant raised no objections to the allegedly impermissible omissions or misrepresentations at trial.

Without objections, the Court is left to assume Defendant abandoned its position for strategic reasons. *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1195 (9th Cir. 2002) (a lack of objections "strongly suggests that counsel made a strategic decision"). For example, allowing Plaintiffs to testify that "almost every sentence in the Petition" was false could have been a strategy to diminish the Steins' credibility by showing unreasonableness or irrationality.

The same reasoning applies to Defendant's argument that Plaintiffs impermissibly attacked the DCS investigation. *See* Doc. 295 at 17–19.[3] The Court informed Defendant ahead of trial that the DCS investigation could be relevant on the issue of Defendant's intentionality or recklessness: "To the extent Plaintiffs can show Defendants failed to follow DCS policies and procedures regarding proper investigation practices, that evidence may be relevant provided it relates to the alleged misrepresentations." Doc. 198 at 10:17–22. The Court advised Defendant the issue could not be decided until hearing the evidence,

---

[3] Defendant's Motion misconstrues the Court's ruling on Defendant's Motion in Limine No. 9 (Doc. 156). The Court precluded Plaintiffs from discussing Defendant's decision not to offer a Voluntary Placement Agreement (VPA). Doc. 198 at 10:23–12:26. But the Court declined to rule on whether Plaintiffs could discuss the DCS investigation until the Court heard more evidence at trial. *Id.* at 10:17–22.

- 10 -

an implicit invitation to raise objections as the evidence came out at trial. Like the Appellant in *H&M*, Defendant now provides the Court with an annotated list of improper testimony. *See* Doc. 295 at 17–19. Missing is a list of Defendant's objections to that testimony.

Plaintiffs gave notice of their intent to argue misrepresentations "including but not limited to" nine specific examples of misrepresentations or omissions in the JPTO. *Id.* The JPTO also listed all the evidence Plaintiffs intended to offer, including Trial Exhibit 34: an annotated copy of the Dependency Petition where Plaintiffs highlighted every "false" statement. Plaintiffs gave fair notice they would use this in testimony and argument. Defendant also knew Plaintiffs intended to discuss the DCS investigation. *See* Doc. 156 and Doc. 198 at 10. Defendant has not identified any issues here that were not fairly embraced by the JPTO.

### c. The Court Did Not Err by Redacting the PPH Order.

Defendant's opening statement featured a section of the juvenile court's Preliminary Protective Hearing ("PPH") Order that addressed whether DCS made "reasonable efforts" to keep CS in the home. Doc. 223 at 30:17–22. Specifically, the order stated: "It was reasonable to make no efforts to maintain the child in the home or to reunify the family based upon the following: crisis situation and no adult able to provide care." Doc. 207-3 at 7. Later, the Court ordered the reasonable efforts section redacted before admitting the PPH Order into evidence. *See* Doc. 260 at 3:7–4:20; PPH Order, Trial Ex. 110 at 6. Defendant argues the reasonable efforts section was "critical (and exculpatory) to defending against the materiality, causation . . ., and damages elements of the Steins' judicial deception claim." Doc. 295 at 13. Defendant argues the Court erred by redacting the "reasonable efforts" section. *Id.*

Relevant evidence can be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403. Unfair prejudice includes an "undue tendency to suggest decision on an improper basis." Fed. R. Evid. 403 Advisory Committee Notes (1972).

Defendant apparently intended to argue that the reasonable efforts section in the PPH Order plainly rebutted the materiality element of the judicial deception claim. *See* Doc. 295 at 12. Specifically, that the reasonable efforts section vindicated Defendant's decisions to remove CS and file the dependency petition. *Id.* at 12:15–23. This seemed an oversimplification of the reasonable efforts finding and the Court spent considerable time probing the significance of that section with the parties. Doc. 275 at 4:7–10:24; Doc. 197; Doc. 207; Doc. 258 at 86:12–90:11, 95:17–106:23, 109:18–110:12; Doc. 260 at 3:7–8:13.

Ultimately, the Court determined the reasonable efforts section was only generally relevant for understanding the removal and dependency proceedings. But it was not probative of the judicial deception claim. *See* Doc. 260 at 4:12–20. Without more foundation and instruction to the jury, Defendant's intended use of the reasonable efforts section—to argue the juvenile court approved Defendant's actions from the preceding week—would have been misleading, confusing, and unfairly prejudicial. Accordingly, the Court properly ordered the reasonable efforts section redacted. Doc. 260 at 4:12–20.

### i. Any Error that might have Occurred Was Harmless.

Plaintiffs argue that if the Court did err by redacting the PPH Order, that error was harmless. Doc. 305 at 17. "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. Whether an error affects a party's substantial rights is a context-specific inquiry and includes, for example, whether the error damaged the fairness of the proceedings or affected the outcome. *Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012).

Defendant argues she and Alyssa Depke were "unable to testify as to the full version of the PPH hearing" due to the redaction in the PPH Order. Doc. 295 at 14. The Court finds this argument unpersuasive for three reasons. First, during a mid-trial discussion on the redaction issue, Defendant proffered that Depke's testimony on the now-redacted section would be very limited: "about ten seconds" or, essentially, the time it would take Depke to read the reasonable efforts finding into the record. Doc. 258 at 109:18–110:6. Second, although Defendant alleges the PPH Order was "critical" to her case, Defendant did not

1    press the Court to admit the order. Defendant first sought to admit the order during Depke's

2    testimony. When Plaintiff challenged this and before the Court ruled, Defendant agreed to

3    seek admission of the PPH Order later using a different witness. Doc. 258 at 110:7–12.

4    Defendant did not return to the PPH Order with another witness or renew her request, so

5    the Court raised the issue *sua sponte* near the close of evidence. *See* Doc. 260 at 3:7–4:20.

6    Third, it is unclear how Defendant Fregoso would have otherwise given a "full version of

7    the PPH hearing" when her testimony at trial was that she did not attend the first half of

8    the PPH, and she did not testify there. *See* Doc. 259 at 41:12–42:1.

9        Defendant's belief that the reasonable efforts section was "critical and exculpatory"

10   also does not mean its preclusion affected a substantial right. At best, the reasonable efforts

11   section would have given the jury ambiguous, tangentially relevant evidence to consider.[4]

12   Redacting the PPH Order did not damage the fairness of the proceedings or affect the trial

13   outcome.

14           **ii.  Defendant's Proposed Limiting Instruction was Confusing.**

15       After the Court's decision to redact the reasonable efforts section, Defendant

16   requested the following limiting instruction to prevent the jury from over-relying on the

17   remainder of the PPH Order: "The court's return of custody to the Steins should not be

---

18   [4] The reasonable efforts section very likely related only to the October 9 removal decision,
     not the October 11 dependency petition. Within 60 days of a child's removal, the juvenile
19   court is required to determine at a hearing "whether it was reasonable to make no efforts
     to prevent **removal** of the child." Ariz. St. Juv. Ct. Rule 47.1(D) (2019) (emphasis added);
20   Ariz. St. Juv. Ct. Rule 50(B)(10) (2017). The juvenile court appears to have made this
     determination at the October 17 PPH, memorialized in the now-called "reasonable efforts
21   finding." *See* Doc. 207-3 at 7. Further evidence supports inferring that the "reasonable
     efforts" finding was the same as the Rule 47.1(D) determination: there was, arguably, a
22   "crisis situation" with "no adult able to provide care" at the removal on October 9; not so
     by October 11.
23
     The Court concludes that the reasonable efforts finding was specific to the removal on
24   October 9 but understands there is ambiguity on exactly which day(s) or event(s) are
     encompassed by it. This ambiguity could have gone before the jury. But doing so would
25   have required substantial instruction on Arizona dependency law and juvenile court rules
     of procedure. Essentially, a minitrial. This minitrial could have further confused the jury
26   because the juvenile court was not adjudicating a judicial deception claim at the PPH. And
     the purpose and evidentiary standards of a PPH are vastly different from those of a federal
27   trial adjudicating a constitutional violation claim. *See* A.R.S. §§ 8-824 and 8-825.

28   This seemed an imprudent use of time for an issue the Court determined to be only
     tangentially relevant to the judicial deception claim. *See* Doc. 260 at 4:12–20.

considered as evidence that defendants committed judicial deception." Doc. 295-3 at 2. But the Court rejected this instruction to avoid confusing the jury and putting undue emphasis on one legal theory over another. Doc. 262 at 3:11–25.

The Court's rejection of this limiting instruction was proper. The proposed instruction misstated the facts (the juvenile court did not return legal custody at the PPH), and it was a misleading statement of the law (return of custody could be considered for the materiality element in a judicial deception claim).

### d. Defendant Failed to Prove Misconduct by Plaintiffs' Counsel.

Defendant argues Plaintiffs' counsel committed misconduct by "repeatedly present[ing] improper legal theories to the Jury." Doc. 295 at 15:6. As addressed above, *supra* III(b)(ii), these legal theories were not improper, and Defendant waived the issue by not objecting. *See Rivera*, 43 F.3d at 1295.

Defendant also argues Plaintiffs' counsel made improper arguments and "impermissibly shifted the burden of proof from the Steins to Lyssa" during Plaintiffs' closing argument. *See e.g.*, Doc. 295 at 6, 10, 14–19. But, again, Defendant neither objected to these statements nor requested a curative instruction. Federal courts "erect a 'high threshold' to claims of improper closing arguments in civil cases raised for the first time after trial." *Hemmings*, 285 F.3d at 1193 (quoting *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th Cir. 1986)); *see also Nunez v. Santos*, 427 F. Supp. 3d 1165, 1195 (N.D. Cal. 2019) (party waived a claim of error by failing to object to statements during a closing argument); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238–39 (1940) (Counsel cannot "remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial."). Further, to the extent any of Plaintiffs' counsel's closing statements were improper, there was no prejudice because the Court properly instructed the jury that "the plaintiffs have the burden of [proof]" and "arguments and statements by lawyers are not evidence." Final Jury Instructions, Doc. 240 at 10, 17.

Plaintiffs' counsel did not engage in misconduct, let alone misconduct that

permeated the trial and prejudiced the jury. *See Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 346–47 (9th Cir. 1995) (finding misconduct when counsel repeatedly violated *in limine* rulings and ignored sustained objections; introduced evidence throughout the trial that was inadmissible, false, and overly prejudicial; and used inadmissible evidence in an inflammatory manner in closing argument).

**e.  Defendant Agreed to the Final Jury Instructions Without Objection.**

Defendant argues the Court committed reversible error by rejecting three proposed jury instructions on (1) reasonable reliance, (2) absolute immunity, and (3) limiting damages. Doc. 295 at 19–21. Plaintiffs respond that Defendant purposefully abandoned the requested instructions by agreeing to the Court's proposed set of final jury instructions. Doc. 305 at 20. Defendant's Reply does not address the waiver issue and instead realleges the instructions were proper on the merits. *See* Doc. 318 at 17–20.

Each party is "entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). "[F]ailure to give an instruction on a party's theory of the case is reversible error if 'the theory is legally sound and evidence in the case makes it applicable.'" *Smith v. Sumner*, 994 F.2d 1401, 1404 (9th Cir.1993) (quoting *United States v. Scott*, 789 F.2d 795, 797 (9th Cir.1986)).

Toward the end of trial, the Court drafted a set of final jury instructions by selecting from each party's proposed instructions and, in some ways, modifying and adding to them. *See* Doc. 258 at 92:24–93:13. The Court's staff then emailed the draft to the parties to review before settling on final jury instructions. *See* Doc. 260 at 97:7–23. Finally, the Court reviewed the draft final instructions with the parties and invited input:

> So, what I would like to do now is go through these jury instructions one at a time. And for most of these, I'm going to get agreement because they have already been essentially stipulated to because both sides stipulated or sent in the same jury instructions. But we'll make a record on that. And then we'll get to those that are in dispute. And we'll talk about those more once we've gone through all of them. **And then each side may have additional instructions that I didn't include that were proposed. You'll want to make a record about those if you think they need to be included now**, or

if there is an instruction that I've included that you don't think should be included. But both sides will be given a chance to do this.

Doc. 261 at 6:24–7:11 (emphasis added). After going through the draft final instructions one at a time, the Court asked the parties to verify whether any instructions were missing.

THE COURT: Any jury instructions, plaintiffs, that you believe I omitted that should be included or any other critiques of the jury instructions that you would like to raise at this time? Mr. Wulkan, is it you? Looks like it is.
MR. WULKAN: No objections.
THE COURT: All right. So, you're not asking for any additional instructions?
MR. WULKAN: No, your Honor.
THE COURT: All right. Mr. Lammers.
MR. LAMMERS: None other than the one we'll talk about in a minute I suspect, the limiting instruction.[5]

*Id.* at 23:20–24:5. Thus, Defendant agreed to the draft final jury instructions and abandoned the three proposed jury instructions that had not been included in the draft. Accordingly, the issue is waived.

## IV.     The Court Will Grant, in Part, Remittitur or a New Trial on CS's Damages

The Court will uphold the compensatory damages awards for Justin and Jackie and the punitive damages award for the Plaintiffs. But the Court will grant remittitur or a new trial on damages for CS. The Court does not reach this decision lightly. The Court has considered each of Defendant's motions and, to that end, combed through the voluminous record to review the evidence, the post-trial submissions by both parties, and the arguments presented.

### a.  Compensatory Damages

#### i.  The Permissible Timeframe for Compensatory Damages

The Court instructed the jury to award damages "caused by the Temporary Orders and Findings." Doc. 240 at 20. CS's removal from the home and Defendant's decision to initiate dependency proceedings were not before the jury. To prevent the jury from improperly considering these events, the Court instructed the jury not to "award damages to Plaintiffs for anything that occurred before the Juvenile Court entered Temporary Orders

---

[5] This limiting instruction is addressed above, *supra* § III(c)(ii).

1   (Exhibit 36) on Monday, October 14, 2019, at approximately 2:20 p.m." Doc. 240 at 21.

2       Defendant argues she is entitled to a new trial on damages because Plaintiffs failed

3   to differentiate between injuries caused by the Temporary Orders and "injuries caused by

4   other events, such as [CS]'s behavior breakdown, the removal, and the court case that

5   resulted from the filing of the Petition." Doc. 295 at 21–22. Defendant further argues the

6   damages are grossly excessive and Plaintiffs are, at most, entitled to no more than nominal

7   damages. *Id.* at 25.

8       The Court agrees Plaintiffs could not recover damages for CS's behavior

9   breakdown, the removal, or Defendant's decision to file the dependency petition. Because

10  these events occurred before October 14, the Court presumes the jury did not award

11  damages for them. *See In re Dan Farr Prods.*, 874 F.3d 590, 595 (9th Cir. 2017) (juries

12  are presumed to follow jury instructions).

13      Aside from the period between October 14 and 17, Defendant characterizes

14  Plaintiffs' remaining injuries as stemming exclusively from "the filing and prosecution of

15  the dependency petition," for which Defendant has absolute immunity as a matter of law.

16  Doc. 295 at 23–25. For example, Defendant argues that ongoing legal custody was

17  triggered by the filing of the dependency petition rather than the issuing of temporary

18  orders. Doc. 295 at 25:6–14. The Ninth Circuit recently rejected this argument in another

19  case involving judicial deception in the dependency context:

20      The crux of [Defendants'] argument is that since they are being sued for

21      conduct that "relate[s] to the initiation of a dependency proceeding," they are
        absolutely immune from suit. However, that argument relies upon an overly

22      broad conception of absolute immunity's scope. As we noted in *Beltran* [*v.
        Santa Clara Cnty.*], a social worker is "not entitled to absolute immunity

23      from claims that they ... made false statements in a dependency petition
        affidavit ... because such actions aren't similar to discretionary decisions

24      about whether to prosecute." [514 F.3d 906, 908 (9th Cir. 2008) (en banc)].
        Surely, the making of such statements in a dependency petition affidavit

25      "relate[s]" in some broad sense "to the initiation of a dependency
        proceeding," as [Defendants] contend, but such a loose relation is not enough

26      to render those actions absolutely immune from suit. The actions themselves
        must be "similar to discretionary decisions about whether to prosecute."

27      *Beltran*, 514 F.3d at 908. . . . [P]roviding false information to the Juvenile

28

Court . . . [is not] "similar to discretionary decisions about whether to prosecute." *Id.* Accordingly, [Defendants] do not enjoy absolute immunity from suit.

*Rieman v. Vazquez*, 96 F.4th 1085, 1091 (9th Cir. 2024).

Defendant's decision to file the dependency petition is protected, but Defendant remains liable for the contents of the dependency petition, which ripened into judicial deception on October 14. To better understand this, it may help to consider the inverse: had Defendant submitted a dependency petition that did not have misrepresentations and/or omissions, and the juvenile court declined to issue temporary orders, the juvenile court would have returned CS to his parents and terminated the dependency case. *See* Doc. 305 at 23.

In the alternative, Defendant argues that the PPH Order was a superseding cause that cut off recovery for any damages after October 17. Doc. 295 at 24 n.7. The Court previously rejected this argument and remains unconvinced. Doc. 226 at 5:21–8:6. The portion of the Court's previous Order on this issue is incorporated herein. *Id.* The October 14 Temporary Orders triggered DCS's physical and legal custody of CS. The Steins regained physical custody of CS after the PPH on October 17, but did not regain legal custody until January 2, 2020, when the juvenile court dismissed the dependency proceedings. The jury was permitted to determine damages for Plaintiffs' injuries stemming from the Temporary Orders, including deprivation of physical custody and companionship (October 14 through 17, 2019), deprivation of legal custody (October 14, 2019, through January 2, 2020), and "mental and emotional pain and suffering." *See* Doc. 240 at 20–21.

### ii. Legal Standard

The amount a jury awards for damages is entitled to "substantial deference" and should be upheld unless it is "clearly not supported by the evidence." *Passantino*, 212 F.3d at 511 n.16. "The testimony of the plaintiff alone can substantiate a jury's award of emotional distress damages." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1029 (9th Cir. 2008).

Damage awards are disturbed only when "the amount is grossly excessive or monstrous" or is "based on passion or prejudice." *Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir. 1999) (en banc) (citing *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir. 1986). To determine whether an award is grossly excessive, courts examine the sufficiency of the trial evidence to support the award. *Bell v. Williams*, 108 F.4th 809, 832 (9th Cir. 2024). The court must interpret the evidence and testimony in the light most favorable to the prevailing party. *See Passantino*, 212 F.3d at 510 n.15; *Bains LLC v. Arco Products Co.*, 405 F.3d 764, 766 (9th Cir. 2005). The court may also look at awards in comparable cases but need not do so unless the award appears unreasonable. *Bell*, 108 F.4th at 832 ("If the evidence is sufficient to support even a high award, there is no need to compare cases.").

 If, after viewing the evidence of damages in a light most favorable to the prevailing party, the court determines that a jury's award is excessive, the court has two options: grant the motion for a new trial or deny the motion conditioned upon the prevailing party accepting remittitur. *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983).

### A. Justin's and Jackie's Damages Award

The jury received evidence that, before October 2019, Justin and Jackie had a loving, caring relationship with CS. *See, e.g.*, Letters to Juvenile Court, Trial Exs. 27, 28, 31; Doc. 225 at 44:14–23. Justin testified CS is "everything to me." Doc. 224 at 14:2. Before the removal, Justin had cared for CS full-time, providing supervision, bathing, dressing, and diaper changing. Doc. 225 at 44:14–23. Justin felt the three days between October 14 and 17 "lasted a very long time." Doc. 225 at 31:17–24. Justin had difficulty eating and sleeping, and he had nightmares. Doc. 225 at 31:17–24. Justin felt like a criminal when he learned on October 17 that DCS wanted to supervise his visits with CS. Doc. 225 at 28:10–14.

Jackie testified that from October 14 through 17, she felt "terrified, scared" and worried about CS, wondering "what condition he was in and what he was going through."

Doc. 219 at 61:15–18. She slept in CS's empty bed because she missed him and the bed smelled like CS. Doc. 219 at 73:3–17. When she learned on October 17 that DCS had proposed she only be allowed visits with CS for two days per week, she felt "Horrible. Isolated. Criminalized." Doc. 219 at 69:8–16.

Justin and Jackie were deprived of legal custody for CS from October 14, 2019, until January 2, 2020. Jackie and Justin both had nightmares throughout this time. Doc. 219 at 71:21–72:18, 74:19–75:3. Jackie dreamed of her kids suffering or dying. 72:9–18. Jackie and Justin's relationship was never the same, and they eventually divorced. Doc. 219 at 70:24–71:20; Doc. 225 at 78:20–25.

Justin testified that the events from October 14 to January 2, 2020, still make him feel angry, upset, and hurt. Doc. 225 at 38:1–15. Justin lives in fear of having his children taken away and he is still in therapy, in part, to deal with the "majority of what happened with DCS." Doc. 225 at 32:6–19, 36:2–3.

Jackie testified extensively about the fear, humiliation, confusion, and distress she experienced because of these events. Doc. 219 at 62:2–65:23, 69:8–78:1. For example, Jackie learned on October 17 that, even if CS were returned to them, she and Justin "wouldn't have any rights to him otherwise: not to make medical decisions, not psychiatric decisions, nothing." Doc. 219 at 62:2–64:12. Jackie feared DCS could still take CS back at any time. *Id.* Jackie also testified about learning of the judicial deception on October 17:

> I felt like an idiot . . .. I really thought . . . I was going to prove [at the PPH] that I was a good parent, and it was just going to be over. And I thought I had nothing to hide, and I don't, but what if they don't believe you? What if it's not enough? I was falsely accused of something that I didn't do.

Doc. 219 at 65:7–21. Even after CS came home, Jackie felt there was a looming threat that DCS could take him: "My hair fell out. I lost ten pounds in a week. My hair still has not grown back. I still have little bald patches where it never grew back." Doc. 219 at 74:9–14. Jackie would wake in the night to watch her children sleeping, or sleep in bed with them. 71:23–72:1, 72:19–73:2.

The jury awarded $184,800 to Jackie and $312,000 to Justin for compensatory

1    damages. Doc. 244 at 3–4. The Court does not find these awards "grossly excessive."

2    Plaintiffs presented evidence and testimony that arguably supported these amounts, and

3    they appear within the range of what is reasonable based on the facts and evidence.

### B. CS's Damages Award

5        "[D]amages must be supported by evidence, not merely inferences based upon

6    characteristics of the victims." *Watson v. City of San Jose*, 800 F.3d 1135, 1140 n.8 (9th

7    Cir. 2015). Emotional damages can be inferred from the circumstances, but they must also

8    be corroborated by testimony or other evidence. *See Mendez v. Cnty. of San Bernardino*,

9    540 F.3d 1109, 1118–19 (9th Cir. 2008), *overruled on other grounds by Arizona v.*

10   *ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (en banc). Plaintiffs had the burden to

11   distinguish between non-compensable injuries caused by a justified substantive loss (i.e.,

12   the period between the removal and the October 14 Temporary Orders) and compensable

13   injuries from the procedural violation (i.e., the unconstitutional separation from October

14   14 through 17). *See* Doc. 295 at 23 (citing *Carey v. Piphus*, 435 U.S. 247, 262 (1978) and

15   *Watson*, 800 F.3d at 1140–42).

16       Based on the evidence at trial, the Court finds CS is entitled to damages for injuries

17   suffered over about 72 hours between October 14 at approximately 2:20 p.m. and the

18   evening of October 17, 2019. During this time, CS received appropriate care. Although he

19   was still agitated and must have missed his parents, his home, and his routine, he was doing

20   much better than he had been during the time immediately before and after his removal

21   from the home (before the judicial deception claim arose). The Court is sensitive that CS

22   is nonverbal and could not testify about his experiences. But most of the evidence about

23   CS's distress centered around non-compensable events that occurred before the judicial

24   deception claim arose. What little evidence there was regarding CS's injuries during the

25   compensable period is detailed in the following section. Suffice it to say that the minimal

26   evidence regarding CS's damages contrasts sharply with the significant and detailed

27   evidence supporting the awards to Justin and Jackie. Further, Justin and Jackie were

28   entitled to damages that accrued over a significantly greater time period. Nonetheless, the

jury awarded CS $605,000, more than the award to both parents combined. Effectively, the jury awarded CS about $200,000 a day for the time he wrongfully remained in the group home. The Court finds this award "grossly excessive" under the circumstances.

The Court must now determine an appropriate amount that is reasonable or justified under these circumstances. *See Fenner*, 716 F.2d at 603 (the court may remit award to "a reduced amount of damage which the court considers justified"). The Court will reduce the award to the greatest amount a juror could reasonably award based on the evidence. *See Unicolors, Inc.*, 52 F.4th at 1087 ("a remittitur must reflect the maximum amount sustainable by the proof").

The Court will reduce CS's damages to $30,000. This reflects the greatest amount a juror could reasonably award based on the evidence. The Court arrives at this figure by foremost considering the trial evidence and testimony, and then looking at awards in comparable cases. Below, the Court "outline[s] specifically, with reference to the evidence presented at trial, the reasons for the amount" of remittitur. *Cosby v. AutoZone, Inc.*, 445 F. App'x 914, 917 (9th Cir. 2011).

### 1.  Evidence Regarding CS and his Damages

By early October 2019, CS had been exhibiting a sharp increase in aggressive behaviors: hitting himself in the head, biting, screaming, and harming others. Doc. 298-1 at 34–35. His behavior came to a head the morning of October 9, when CS attacked Justin in the car, nearly causing an accident. That same day, DCS removed CS and placed him in a foster home.

Evidence at trial showed CS was distressed by the removal. Foster parent, Patty Sinko, testified that CS was agitated, pacing, vocalizing, biting, and lashing out. The next day, the Sinkos took CS to the Crisis Response Center, where CS had to be medically subdued. *See* ICHD Records, Trial Ex. 12 at 124; Risk Assessment, Trial Ex. 23 at 0038; Jackie Text Messages, Trial Ex. 106 at 15. By October 13, CS had adjusted to his new medication and appeared calm. ICHD Records, Trial Ex. 12 at 134. His therapist, Ken Baumgartner, helped CS transition to a new group home by bringing comfort items and

familiar foods. Doc. 298-1 at 69–70. At the group home, CS was pacing, engaging in some self-harm, and having difficulty falling asleep. ICHD Records, Trial Ex. 12 at 120; Jackie Text Messages, Trial Ex. 106 at 19; Doc. 219 at 51:11–52:6; Doc. 298-1 at 94. But before the judicial deception claim accrued CS was no longer harming others and appeared stable. Jackie Text Messages, Trial Ex. 106 at 19.

There is some information about CS's condition between October 14 and 17. On October 14, Ken Baumgartner completed an assessment that found CS's "tendency toward internalization of emotional distress is at the clinically significant level while his tendency toward externalization of distress is at the elevated level." Vineland Rep., Trial Ex. 44 at 6. As of October 15, CS had reduced his aggression and self-harming behaviors, but CS was still pacing and exhibiting other behaviors of anxiety at the group home. Doc. 258 at 79:24–81:8; *see also* ICHD Records, Trial Ex. 12 at 138; Jackie Text Messages, Trial Ex. 106 at 23. The Court can also make a few inferences about CS's condition during this time. His therapist and parents testified that CS required predictability and stability, and that disruption to CS's routines could cause intense psychological distress. Doc. 219 at 30:10–11; Doc. 298-1 at 69–71; *see also* ICHD Records, Trial Ex. 12 at 160. While the period between October 9 to 14 is not compensable, CS's behavior during that time is relevant to understanding how a disruption to CS's routine adversely affected him. Further, CS was an 8-year-old child, nonverbal and on the autism spectrum, with a very limited ability to understand what was happening to him and why. And, before these events, he had never spent a night away from both parents. Jackie Text Messages, Trial Ex. 106 at 20. Thus, it is reasonable to infer that each of the approximately three days CS was wrongfully separated from his parents, kept in an unfamiliar place, and deprived of his routine caused distinct emotional and psychological distress.

CS returned home on October 17, medicated and stable. Doc. 219 at 76:18–23. That evening, Jackie texted family that CS was "so happy to be home" and it was "a flipping miracle" because CS was talking on his own. Jackie Text Messages, Trial Ex. 106 at 45. Although DCS had legal custody until January 2020, there is no evidence CS understood

that there was an ongoing dependency proceeding and it seems beyond doubt that he did not. Although CS continued to manifest symptoms related to the trauma he experienced, the Court saw no evidence that any new injury occurred after October 17, 2019.

Jackie testified that, after these events, CS exhibited ongoing distress: he seemed more anxious and had trouble sleeping. CS also often needed a parent to sleep with him and would cling to Justin on outings. Justin testified that he believes CS was negatively impacted by the three additional days in DCS custody. The evidence showed CS was in much greater distress during the period after his removal, but before the judicial deception claim arose. There can be little doubt that the most traumatic period for CS was the time immediately before and after his removal from his home, but this period is non-compensable. It is possible that at least some of CS's ongoing distress can be attributed to the separation between October 14 and 17, but Plaintiffs had the burden to prove it, and they failed to do so.

The Court finds sufficient evidence to compensate CS for the wrongful separation from his parents between October 14 at approximately 2:20 p.m. until the evening of October 17, 2019. Based on the evidence and testimony at trial, the Court finds the maximum supportable award for CS's injuries is $30,000.

### 2. Damage Awards and Settlement Amounts in Comparable Cases

The Court gave foremost priority to the evidence at trial when calculating the remittitur. *See Bell*, 108 F.4th at 832. But, because the jury's damages award to CS was unreasonable, the Court also looked at comparable cases. *See id.* The Court focused on certain characteristics of CS's experience when looking for comparable cases: CS's diminished ability to cope with separation due to his young age and autism diagnosis; the interruption of pre-existing therapeutic services; the relatively short duration in custody; and deprivation of comfort, routine, and familiarity.[6] The Court also recognizes CS's

---

[6] *See, e.g.*, *Olvera v. Cnty. of Sacramento*, 2014 WL 4365144 (E.D. Cal. May 19, 2014) (7-year-old child with severe emotional and behavioral disorder wrongfully removed from his therapeutic care home received approx. $9,567.05 per day for each of the fourteen days he was in foster care); *Robaina v. Cnty. of Riverside*, 2017 WL 2973406 (C.D. Cal. May 3, 2017) (1- and 4-year-old siblings each received approximately $5,000 per day for the four days they were wrongfully in foster care); *Rivera v. Cnty. of Los Angeles*, 2019 WL

1   injuries arose from the separation itself and not, for example, because the placement was

2   inappropriate or harmful.[7] Every case is unique and the cases surveyed are not perfectly

3   analogous to this one, but taken together they do lend support to the Court's $30,000

4   damages award.

5     **b. Punitive Damages**

6     The jury awarded $33,333 each to Justin and Jackie, and $33,334 to CS in punitive

7   damages. Doc. 244 at 3–5. A jury's award of punitive damages, if supportable, is not to be

8   lightly disturbed. *See Kennedy v. Los Angeles Police Dep't.*, 901 F.2d 702, 707 n.3 (9th Cir.

9   1989). A punitive damages award may be reduced if it is so high that it violates due process.

10  *BMW of N. Am., Inc., v. Gore,* 517 U.S. 559, 574–75 (1996). To determine whether punitive

11  damages violate due process, the court considers: (1) the reprehensibility of defendant's

12  conduct; (2) the ratio between any compensatory award and the punitive award; and (3) a

13  comparison of the damage award to any civil penalties authorized or imposed in

14  comparable cases. *Id.*; *State Farm. Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418

15  (2003).

16    The first factor, reprehensibility, is the "most important indicium of the

17  reasonableness of a punitive damages award." *Id.* at 575. The Ninth Circuit has explained

18  that reprehensibility falls along a scale, with threats and violent acts at the top, "followed

19  by acts taken in reckless disregard for others' health and safety, affirmative acts of trickery

20  and deceit, and finally, acts of omission and mere negligence." *Swinton v. Potomac Corp.*,

21  270 F.3d 794, 818 (9th Cir. 2001). Defendant's conduct here falls in the middle of the scale,

22  because the jury found she committed a deceptive act in reckless disregard of Plaintiffs'

---

23  8887998 (C.D. Cal. Aug. 14, 2019) (minor children each received approximately $4,464.28
24  per day wrongfully spent in foster care).
 [7] *Cf. Straughter v. City and Cnty. of San Francisco*, 2020 WL 3865033 (N.D. Cal. Feb. 4,
25  2020) (minor and parent plaintiffs received $160,000 for three days of wrongful custody
in detention facility) and *Abdullah v. City and Cnty. of San Francisco*, 2020 WL 7383283
26  (N.D. Cal. Aug. 18, 2020) (minor received $85,000 for 11 days wrongful custody in
detention facility); *Mann v. Cnty. of San Diego*, 2016 WL 9115549 (S.D. Cal. Sep. 26,
27  2016) (four children each received $25,000 for being subjected to invasive genital/rectal
medical examination during the two days wrongfully in DCS custody) and (*Swartwood v.
28  Cnty. of San Diego*, 2015 WL 1400683 (S.D. Cal. Feb. 13, 2015) (two children each
received $75,000 for being subjected to invasive genital/rectal medical examination during
the two days wrongfully in DCS custody).

constitutional rights. Social workers have immense power over families. The jury found Defendant used that power to prepare and verify a materially misleading dependency petition. The first factor weighs in favor of upholding the jury's punitive damages award.

Second, the Court considers the ratio between the punitive and compensatory damages. Without deciding on a purely mathematical formula, *Gore* considered the constitutionality of cases where punitive damages outweighed compensatory damages 4:1, 10:1, or even 500:1. Here, the punitive damages represent a fraction of the compensatory damages awarded, even after remittitur (about 1:5 for Jackie; 1:9 for Justin; and 1:1 for CS). This suggests a reasoned approach by the jury to deter unlawful behavior, without seeking a way to supplement Plaintiffs' compensatory damages. Thus, the second factor weighs in favor of upholding the jury's punitive damages award.

The third factor entails looking at awards authorized in comparable cases. Defendant did not provide any argument or evidence on the third factor in her Motion. *See* Doc. 295 at 21–26. Accordingly, Plaintiffs did not specifically address it either. Defendant's Reply provided a sample case to argue that the ratio of punitive damages is excessive here. Doc. 318 at 24 n.7 (citing *Chatman v. Ferrell*, No. 2:17-cv-03826-PHX-DLR, 2020 WL 736309 (D. Ariz. 2020)). In *Chatman*, the jury awarded $150,000 in compensatory damages and $15,000 in punitive damages to one of the plaintiffs (the other two plaintiffs received $250,000 each in compensatory damages and no punitive damages). Verdict Form, No. 2:17-cv-03826-PHX-DLR, Doc. 193 (D. Ariz. March 11, 2021). Based on the unique facts considered by the jury, the punitive damages award here is not unreasonable compared to the amount awarded in *Chatman*. The third factor also weighs in favor of upholding the jury's punitive damages award.

Viewing the evidence in the light most favorable to Plaintiffs, the punitive damages awarded are not "grossly excessive or monstrous." *Lambert*, 180 F.3d at 1011. Nor do the awards appear to be the "product of passion and prejudice." *Id.* Consequently, the punitive damages awarded to Plaintiffs are not demonstrably excessive and do not warrant a new trial or remittitur.

V.    **ORDER**

**IT IS ORDERED granting in part and denying in part** Defendant's Amended Motion for New Trial or, Alternatively, for Remittitur (Doc. 295). Defendant's request for remittitur is granted in part as set forth above. All other requests in the Motion are denied.

**IT IS FURTHER ORDERED** Plaintiff CS has until **May 9, 2025** to file a notice with the Court either (1) accepting the remittitur of $30,000 in compensatory damages or (2) requesting a new trial as to damages for CS only.

Dated this 25th day of April, 2025

Honorable John C. Hinderaker
United States District Judge